Charles **ROBERTS,** an individual, and Kenneth McKay, an individual, on behalf of themselves and others similarly situated, Plaintiffs,

v.

C.R. ENGLAND, INC., a Utah corporation; Opportunity Leasing, Inc., a Utah corporation; and Horizon Truck Sales and Leasing, LLC, a Utah Limited Liability Corporation, Defendants.

Case No. 2:12–CV–00302–RJS–BCW

United States District Court,
D. Utah,
Central Division.

Signed 01/31/2017

---

**27.** *See* Doc. 53, Tr. Discovery & Sch. Conf. before Judge O'Hara, at 26 (expressing desire to obtain relief as soon as possible).

458

467

San Rafael, CA, Thomas R. Karrenberg, Heather M. Sneddon, Anderson & Karrenberg, Salt Lake City, UT, Aaron H. Aizenberg, Benjamin R. Prinsen, Christopher J. Krawczyk, Stephen E. Kravit, Benjamin J. Glicksman, Kravit Hovel & Krawczyk SC, Milwaukee, WI, Jon V. Harper, Harper Law PLC, Salt Lake City, UT, for Plaintiffs.

Drew R. Hansen, Theodora Oringher PC, Costa Mesa, CA, James S. Jardine, Adam Kenji Richards, David B. Dibble, Scott A. Hagen, Ray Quinney & Nebeker, Salt Lake City, UT, for Defendants.

### MEMORANDUM DECISION AND ORDER

ROBERT J. SHELBY, United States District Judge

This is a putative class action brought against two affiliated trucking companies by drivers once associated with those companies. Plaintiffs Charles Roberts and Kenneth McKay allege that Defendants C.R. England, Inc. and Opportunity Leasing, Inc. developed a fraudulent plan to induce thousands of people to enroll in England's driver training schools by promising students the choice of eventual employment as a company driver or the ability to earn a desirable income driving as an independent contractor. Plaintiffs contend that in reality, company driver positions were largely unavailable, and students in the driver training schools were subjected to a misinformation campaign to convince them to lease trucks from the Defendants and become independent contractor drivers affiliated with England. Hundreds, if not thousands, of students were persuaded to invest substantial sums of money to lease trucks from Defendants and become independent contractor drivers. But many soon found they could not earn a living as they had been led to believe, and were left debt-ridden. Plaintiffs sue to recover on behalf of these drivers and now move the court for class certification.[1]

Defendants acknowledge the hardship accompanying the life of a long-haul trucker, but vigorously deny Plaintiffs' allegations.

Kevin P. Roddy, Wilentz Goldman & Spitzer PA, Woodbridge, NJ, Robert S. Boulter,

1. Dkt. 206.

Defendants oppose class certification,[2] move for judgment on the pleadings on several of the Plaintiffs' claims,[3] and request summary judgment under several theories.[4] To Defendants, the fraud Plaintiffs allege is a fiction, and myriad individualized issues make this case unsuitable for class certification.

After careful consideration of the pleadings, the parties' extensive briefing and post-hearing submissions, the record developed, and the arguments presented by counsel, the court grants Defendants' motion for judgment on the pleadings, denies Defendants' motion for summary judgment, and grants in part and denies in part Plaintiffs' motion for class certification.

## TABLE OF CONTENTS

### BACKGROUND

I. Overview of C.R. England and Opportunity Leasing, Inc. (Horizon)...469

II. The Third Amended Complaint (Dkt. 101)...470

 A. General Allegations...470

 B. Allegations Specific to Individual Plaintiffs...471

 C. Claims for Relief...472

III. Facts Relating to the Motion for Class Certification...472

 A. Implementation Plan...472

 1. Online Advertising...473

 2. Program Brochures...473

 3. Initial Recruitment...473

 4. Student Training Agreement...474

 5. England's Training Program...474

 6. England Business Guide...475

 B. Experiences of Proposed Class Representatives...477

 C. Experiences of Other Drivers...478

 D. Driving Opportunity...479

 E. Uniformity...480

 F. Turnover Rates...481

 G. OWNRRE Database...481

IV. Facts Relating to Choice of Law...481

### ANALYSIS

I. Motion for Partial Judgment on The Pleadings (Dkt. 189)...482

 A. Standard for Judgment on the Pleadings...482

 B. Standard for Plaintiffs' RICO Claim...483

 C. Analysis of Plaintiffs' RICO Claim...484

 1. The Relationship Between Drivers and the Enterprise...485

 2. England and Horizon as Persons and Enterprise...487

 D. Analysis of Palintiff's UPUAA Claim...490

II. Motion for Summary Judgment (Dkt. 230)...491

 A. Standard on Summary Judgment...491

 B. Choice of Law...491

 1. Effect of Choice of Law Provision in the Agreements...492

 2. Application of Restatement Section 145/148 Factors...497

 C. Existence of an Assisted Marketing Plan...494

 1. Initial Required Consideration...495

 2. Seller Representation...496

 D. Preemption...497

 1. "Related to" Requirement...499

 2. Transportation Services...500

 E. Statute of Limitations...501

III. Motion for Class Certification (Dkt. 206)...503

 A. Standard for Class Certification...503

 B. Rule 23(a)...504

 1. Numerosity...504

 2. Commonality...504

 3. Typicality...510

 4. Adequacy...512

 C. Rule 23(b) Factors...512

---

**2.** Dkt. 245.

**3.** Dkt. 189.

**4.** Dkt. 230.

1. Predominance...512

D. Superiority of Class Action...523

E. The Utah Consumer Sales Practice Act & Administrative Notice...524

F. Notice...525

## BACKGROUND

### I. OVERVIEW OF C.R. ENGLAND AND OPPORTUNITY LEASING, INC. (HORIZON)

C.R. England, Inc. is a nationwide trucking company specializing in temperature-controlled transportation. Headquartered in West Valley City, Utah, England has been a family-run business since its inception in 1920. After nearly a century of expansion, it is now Utah's fifth-largest employer. Between 1965 and 2005, England's annual revenue increased from $1 million to over $544 million. Dan England, a grandson of England's founder, oversaw much of this growth as the company's chief executive officer. His son, Josh England, currently serves as the company's president and chief financial officer. England and its affiliated company's growth continued to skyrocket through at least 2009.

England family members formed Opportunity Leasing, Inc. in 1997.[5] The company often operates under the name Horizon Truck Sales and Leasing, although it has entered into contracts under its corporate name.[6] Horizon exists primarily to lease trucks to drivers who have chosen to work as independent contractors affiliated with England.[7]

The parties differ in their views of Horizon's relation to England. Defendants contend that Horizon and England are separate but affiliated corporate entities, while Plaintiffs see Horizon as a part of England's "empire."[8] Referencing internal audits, organization charts, and financial statements, Plaintiffs argue that the two Utah-based, England family-owned businesses consolidated their finances,[9] and sometimes shared management.[10] For example, Mitch England testified that he ran Horizon while working as a vice president for England. Testimony and internal documents suggest that after the England family formed Horizon, Horizon reported to England's Independent Contractor Division, which was managed by Josh England, Michael Fife, and Mitch England.[11] Finally, internal documents suggest that England actively tried to increase the number of Horizon leases, further suggesting a close connection between the two companies.[12] In short, Plaintiffs characterize Horizon as a sales organization operating with the goal of securing as many leases as possible from England's independent contractors.[13] The means of achieving this alleged goal lie at the heart of this litigation.

Since its founding, England traditionally relied on experienced company drivers and a fleet of trucks to move freight for its customers. But beginning in about 1998, after Horizon was formed, England began using independent contractors to compete with other carriers that were doing so.[14] Dan England testified that his company discovered that independent contractors "were often better, more productive, and more responsible drivers."[15] England often compensated company drivers differently than independent contractors.[16]

---

**5.** Dkt. 245 at 8.

**6.** In the briefing and exhibits, the parties refer to Defendant Opportunity Leasing, Inc. alternatively as "Opportunity" or "Horizon." The court refers to this Defendant as Horizon.

**7.** Dkt. 245 at 8. Horizon also occasionally sells or leases trucks or equipment to third parties. *Id.,* n.17.

**8.** Dkt. 206 at 10.

**9.** Dkt. 206 at 10–11 (citing Appx. at 2306, 4224, 4309, 4264).

**10.** Dkt. 206 at 11(citing Appx. at 3134–35, 3246–50, 3253–54).

**11.** *Id.*

**12.** *See, e.g.,* Pla. Appx. at 1317, 4219, 2424, 3165.

**13.** Dkt. 206 at 11 (citing Appx. at 2426, 3318, 3136, 3218–20, 3226, 3159–62).

**14.** Dkt. 245 at 9.

**15.** Dkt. 246–9 at ¶ 13.

**16.** England used the example of compensating a company driver $0.25 per mile, while an independent contractor received $0.90 per mile, in part to cover the costs of a truck lease and fuel. (Dkt. 245 at 9.)

As England's business expanded in recent years, so too did its need for experienced drivers. To meet this demand, it established five driver training schools in Utah, California, Texas, and Indiana where students could earn a commercial driver license.[17] These schools offered the chance to earn a commercial driver license to individuals with no prior experience.

England enrolled 94,095 individuals in its schools between 2008 and 2012. These students paid tuition ranging from $1,995 to $2,995, depending on financing—rates England contends were lower than similar commercial driver license programs. In fact, England claims it does not profit from the schools.

According to England, students who graduated with their commercial driver license were given the option to train for an additional ninety days as an England employee. A total of 38,524 drivers completed England driving school curriculum and advanced to England's driver training program. This training consisted of Phase I and Phase II, which are described below. After completing Phase I and Phase II, trainees returned to Utah or Indiana "to pass final checks" and attend an orientation.[18] After completing the training program, some trainees became England employees, while other trainees— numbering in the thousands—became independent contractors affiliated with England but with personal truck leases from Horizon.

In 2004 and 2005, England analyzed driver profitability, comparing its company drivers and affiliated independent contractors.[19] Plaintiffs maintain that this analysis showed that England earned more from using independent contractors than company drivers.[20] Plaintiffs contend this was "a watershed moment" that led England to abandon its traditional company driver model in favor of independent contractors.[21] Maximizing the number of leases and lease operators became an important objective for both England and Horizon. Plaintiffs refer to this objective and related efforts as the Implementation Plan, which is discussed below.

The numbers suggest that the Implementation Plan succeeded. Between 1998 and 2002, England's projection for active leases varied between 290 and 594. But by 2009, the number of active truck leases at one point exceeded 2,200, or eighty percent of England's fleet. Although the percentage of independent contractors for England can fluctuate, according to Defendants, independent contractors currently operate twenty-four percent of England's fleet. As of February 2014, England employed 7,351 full-time employees. Approximately 13,143 individuals became independent contractors for England between January 1, 2008 and December 31, 2013.[22]

## II. THE THIRD AMENDED COMPLAINT (DKT. 101)

Plaintiffs Roberts and McKay attended an England training school, where each obtained a commercial driver license and eventually became independent contractors for England, operating trucks leased from Horizon.[23] After several months, Roberts and McKay ended their affiliation with England and filed this case as a class action against England and Horizon. The allegations in Plaintiffs' Third Amended Complaint[24] are central to the motions before the court.

### A. General Allegations

Plaintiffs allege that Defendants used misrepresentations in a nationwide advertising campaign promising "guaranteed job[s]" with England which did not exist to persuade thousands to enroll in England's driver training schools, where each student paid thou-

---

17. Dkt. 245 at 10.

18. *Id.* at 14.

19. England also compared solo drivers and teams.

20. Dkt. 206 at 11.

21. Dkt. 206 at 11–12.

22. Declaration of Tricia O'Neal, Director of Payroll and IC Administration for England (Dkt. 246-34 at ¶ 4.)

23. Dkt. 101 at 23.

24. Dkt. 101.

sands of dollars in tuition.[25] Defendants then targeted students with a "classic bait and switch fraud" in a concerted effort to coerce them to invest in a program known as the "Driving Opportunity." [26] Participants in the Driving Opportunity program signed a Horizon Truck Sales and Leasing Vehicle Lease Agreement (Lease Agreement) and an Independent Contractor Operating Agreement (Operating Agreement).[27] These drivers then became independent contractors for England, driving trucks leased from Horizon. They did this in lieu of obtaining traditional employment with England as company drivers. Plaintiffs contend that Defendants recruited thousands of drivers as independent contractor drivers by misrepresenting the true income opportunities of lease drivers and failing to inform recruits of high turnover in the industry.[28]

## B. Allegations Specific to Individual Plaintiffs

Roberts alleges that in May 2009, he viewed an advertisement on England's website from his home in California. Based on England's "representations of training, employment, the Driving Opportunity, and the potential income," Roberts submitted an online application to England, spoke with two England representatives on the phone, and ultimately attended a driver training school in California.[29] Although England provided transportation and housing, Roberts borrowed money to cover the cost of his tuition. After arriving, Roberts signed a Student Training Agreement and received a copy of the England Business Guide.[30]

Also a California resident, McKay learned about England's training program from its website in January 2009 and submitted an online application. During an initial phone interview and a follow-up conversation, England's Utah-based representatives allegedly confirmed that McKay could earn at least $30,000 per year. McKay alleges he never learned about high turnover or failure rates. After borrowing the cost of his tuition, McKay attended the California training school in February 2009, where he signed a Student Training Agreement and received a copy of the England Business Guide.[31]

According to the Third Amended Complaint, Plaintiffs and other drivers received training materials that included material misrepresentations in advertisements and in the England Business Guide. After students completed school and Phase I and Phase II training, Defendants allegedly used recruiters, inaccurate data in graphs, and delay tactics to convince Plaintiffs and other trainees to purchase the Driving Opportunity and to dissuade these same trainees from seeking employment as company drivers.

For example, McKay alleges that England informed him that no company driver positions were available and his only option was to purchase the Driving Opportunity. Eventually, McKay purchased the Driving Opportunity under a six-month lease in July 2009.[32] Similarly, Roberts alleges that he purchased the Driving Opportunity in September 2009. According to Plaintiffs, England informed them and other drivers that if they wanted to get on the road, they needed to lease immediately from Horizon.[33] Plaintiffs aver that they and thousands of drivers purchased the Driving Opportunity and signed "substantially identical" agreements in part because no

---

25. Dkt. 101 at 3–5.

26. Dkt. 101 at 4.

27. According to Plaintiffs, the Driving Opportunity is synonymous with the "Horizon Truck Sales and Leasing Program" and "C.R. England Independent Contractor Program." (Dkt. 101 at 2–3.)

28. For example, Plaintiffs allege that England's annual turnover was between 100% and 140% and at times reached a high rate of 225%. (Dkt. 101 at 11.)

29. Dkt. 101 at ¶¶ 26, 32–33.

30. According to Plaintiffs, the England Business Guide is now distributed as the Equinox Business Guide.

31. Dkt. 101 at ¶¶ 41–45.

32. Dkt. 101 at ¶ 52.

33. Dkt. 101 at ¶ 80.

other options were available to them.[34]

## C. Claims for Relief

The Third Amended Complaint includes fourteen claims for relief. Plaintiffs seek class certification on ten claims. These ten claims generally fall into three categories.

First, Plaintiffs claim Defendants violated the federal Racketeer Influenced and Corrupt Organizations Act (RICO) and Utah Pattern of Unlawful Activity Act (UPUAA) by fraudulently inducing individuals into purchasing the Driving Opportunity, which in turn transferred financial risk from England to unsuspecting lease drivers.[35] Defendants ask the court to enter judgment on the pleadings for both the RICO and UPUAA claims.[36]

Second, Plaintiffs allege Defendants violated the Utah Consumer Sales Practices Act, the Utah Business Opportunity Disclosure Act, and the Utah Truth in Advertising Act.[37] While the contours of these claims vary, each arises out of allegations that Defendants fraudulently induced drivers into entering the Driving Opportunity in violation of a state statute. Defendants move for summary judgment on the Utah Business Opportunity Disclosure Act claim.[38]

Third and finally, Plaintiffs assert four claims for relief under common law theories of recovery: (1) fraud and misrepresentation, (2) breach of fiduciary duty, (3) unjust enrichment, and (4) breach of contract.[39] As discussed below, Plaintiffs seek varying categories of class certification for these claims.

## III. FACTS RELATING TO THE MOTION FOR CLASS CERTIFICATION

Plaintiffs ask the court to certify a nationwide class for claims arising under Utah state statutes for violations of the Utah Business Opportunity Disclosure Act, the Utah Consumer Sales Practices Act, and the Utah Truth in Advertising Act. Plaintiffs also move for certification of a nationwide class for their negligent misrepresentation, breach of fiduciary duty, and unjust enrichment claims.[40]

Plaintiffs also propose certification of two subclasses. The first subclass includes independent contractors who purchased the Driving Opportunity Defendants offered during the period when Defendants were utilizing the England Business Guide.[41] For this subclass, Plaintiffs intend to pursue relief under their common law fraud claim, as well as claimed violations of RICO and the UPUAA.[42] The second subclass consists of drivers who executed the Student Training Agreement and then later purchased the Driving Opportunity.[43] For this subclass, Plaintiffs assert a breach of contract claim.

Both parties have submitted voluminous records in support of their respective positions on class certification. The court recites below the evidence most relevant to the class certification issues presented.

## A. Implementation Plan

Plaintiffs argue that after England analyzed in 2004 and 2005 the profitability of its drivers, it sought to increase the percentage

---

34. Dkt. 101 at ¶ 55.

35. Dkt. 101 at ¶¶ 113–154. In the Third Amended Complaint, the RICO claim is asserted on behalf of Plaintiffs and a National Class, while the UPUAA claim is asserted on behalf of Plaintiffs, the National Class, and a Utah Class consisting of drivers offered the Driving Opportunity while physically present in Utah. (Dkt. 101 at ¶ 102(e).)

36. Dkt. 189.

37. Dkt. 101 at ¶¶ 183–96, 240–256. These statutory claims are asserted on behalf of Plaintiffs, the National Class, and the Utah Class.

38. Dkt. 230.

39. Dkt. 101 at ¶¶ 215–39. In the Third Amended Complaint, these common law claims are asserted on behalf of Plaintiffs, the National Class, and the Utah Class. The breach of contract claim arises out of the Student Training Agreement and appears to be asserted only against England.

40. Dkt. 206 at 1–2.

41. Dkt. 206 at 2, 23 n.53, 59.

42. *Id.*

43. Dkt. 206 at 13. Plaintiffs believe that England used the Student Training Agreements between at least December 24, 2007 and May 24, 2011. *Id.*

of independent contractors affiliated with the company as compared to company drivers. In 2005, it adopted a concerted recruitment strategy—the Implementation Plan—to further this goal. Internal documents and deposition testimony suggest that both Horizon and England were concerned about recruitment efforts due to high driver turnover.

## 1. Online Advertising

England used online marketing to increase recruitment. On their respective websites, England and Horizon made representations about the merits of joining England or working as an independent contractor.[44] In 2010, for example, England's website indicated that the projected annual income for a lease operator was $44,400.35, based on 3,250 miles per week. Similar statements were posted on Horizon's website. England modified these projections by 2011, stating instead that average weekly miles ranged from 1,800 to 3,000. According to Plaintiffs, solo lease operators actually averaged 1,891 miles at the time.[45] These websites do not appear to have referenced high turnover rates or actual average income for independent contractors.

In response to Plaintiffs' website exhibits, Defendants submit testimony of trainees who neither visited nor relied on information displayed on the websites. Defendants also contend their websites displayed "potential" mileage, as opposed to the average mileage of an independent contractor, and contained a disclaimer indicating that income depended on individual performance. Finally, Defendants maintain that England also relied on print media, television, radio, billboards, truck trainers, and word of mouth for advertising during the relevant time periods.[46]

**44.** *See, e.g.,* Pla. Appx. at 118, 732, 2307–16.

**45.** According to Plaintiffs, deposition testimony suggests that Defendants understood these mileage estimates were not wholly accurate.

**46.** Declaration of Steve Branch, Director of Advertising for England (Dkt. 246–33 at ¶ 5.)

**47.** *See* Dkt. 206 at 22–23.

**48.** Pla. Appx. at 1411.

## 2. Program Brochures

Plaintiffs contend that England's Independent Contractor Division created brochures with inaccurate statements about the number of miles and income opportunities available to lease operators.[47] Although some of the brochures predate the class period in this case, the evidence suggests that Defendants at times overrepresented the average number of miles available to its independent contractors.

Similar to the websites, Defendants argue that the brochures merely contained potential mileage and income, as opposed to a specific calculation of average income. Defendants point to a disclaimer that indicated "actual income will vary based on individual performance." Finally, Defendants point out that the brochures, which varied over time, were not publicly distributed, but were available to trainees at the Horizon offices.

## 3. Initial Recruitment

England instructed its recruiters to contact potential drivers within twenty-four hours of receiving an application for the driving school.[48] Though the parties dispute the issue, there is evidence England carefully developed its recruitment program and encouraged its recruiters to follow a prepared script.[49]

In 2008 and 2009, England provided manuals to its recruits touting the advantages of its independent contractor program[50] For example, in a Driver Recruiting Information Guide last revised in 2008, England represented that lease operators could "average between $40–$50,000.00 their first year of leasing after expenses."[51] In 2008, the manuals suggested that the average number of weekly miles for a solo lease operator was between either 2,800 and 3,200 or 2,800 and 3,300.[52] According to Plaintiffs, inaccurate

**49.** *See, e.g.,* Pla. Appx. at 1405–50.

**50.** *See, e.g.,* Pla. Appx. at 1380.

**51.** Dkt. 206 at Appx. 0044–45; *see also id.* at Appx. 4161.

**52.** *See also* Pla. Appx. at 0044–45, 4161. Mike Fife testified that sales representatives used a standard script developed by the company "geared around overcoming objections, helping

statements survived revisions of the recruiting manual until October 2012. [53]

Manuals for England's recruiters instructed them on the best ways to overcome an applicant's potential objections or questions. Cathy Mattan, a former telephone recruiter, submitted a declaration describing her personal experiences with England's recruiting policies.[54] According to Ms. Mattan, England trained her and other recruiters from a manual containing uniform scripts.[55] England required Ms. Mattan to enroll as many students as possible. When she left the company, she had a poor view of how England treated its students, whom she believes were often uneducated, hungry, and desperate for work. Ms. Mattan recalled drivers waiting for weeks at undesirable England-provided lodging for a company position and company truck. She testified that most of those drivers did not obtain company driver positions, but instead ended up leasing trucks.[56]

In response to Ms. Mattan's declaration, Defendants argue that recruiters were instructed to tailor their discussions to individuals. According to Steve Branch, England's Director of Recruiting and Advertising from December 2008 until March 2013, every single call was different but recruiters were "always instructed to give accurate and truthful information." [57] Defendants further contend that the manuals and guides Plaintiffs cite were general references, rather than specific scripts to be used uniformly. In Defendants' view, these varied recruiting approaches undermine Plaintiffs' contention that uniform scripts were used to secure enrollment in the independent contractor

program. Rather, Mr. Branch agreed that the primary purpose of recruitment was "to get [people] into the schools." [58]

### 4. Student Training Agreement

During training, some trainees entered into a Student Training Agreement with England. In the Student Training Agreement, trainees agreed to complete England's training program in return for career opportunities.[59] The training was divided into two phases. During Phase I, the student received pay and on-the-job training from a certified driving trainer. The student agreed that Phase I "will be a minimum of 30 days in duration and near the end of this phase I will be given a road evaluation and attend a 1 day certification program." [60]

During Phase II, the student would work as "a C.R. England employee assigned as a 2nd seat to a [P]hase II trainer." [61] England stated that this phase provided the student with an "opportunity to observe the C.R. England lease program and receive further training in running my own business, plus gain additional experience." [62] After Phase II, the student could "choose one" of four career paths. Under the Student Training Agreement, a student could "[b]ecome a lease operator [or] Phase II Trainer." [63] Alternatively, the student could "[r]emain a C.R. England employee as a second seat [or] employee with a company truck." [64]

### 5. England's Training Program

Citing declarations of former employees, deposition testimony, and company docu-

---

to clarify, answering questions, things of that nature." *Id.* at 3165 ("So we are all kind of singing from the same hymn book, if you will.").

53. *See* Pla. Appx. at 1625.

54. Dkt. 218 at ¶ 5 (redacted version of Ms. Mattan's Declaration.)

55. Plaintiffs also provide an example of a pitch in which the recruiter represented average weekly mileage was between 2,800 and 3,000 miles, which would result in a salary of between $40,000–50,000 after expenses. *See* Pla. Appx. at 1381–82) (containing example of average settlement).

56. Dkt. 218 at ¶ 18.

57. Dkt. 246–33 at ¶ 6. Mr. Branch is now England's Director of Advertising.

58. Dkt. 246–55 at 9 (Branch Deposition at 241).

59. *See, e.g.,* Dkt. 101, Ex. O.

60. *Id.*

61. *Id.*

62. *Id.*

63. *Id.*

64. *Id.*

ments, Plaintiffs contend Defendants continued to use uniform misrepresentations to induce students into becoming lease operators at training schools and during Phase I and Phase II training.

For example, Defendants appear to have indicated in a PowerPoint slide entitled "Lease Program FAQs" that a solo lease operator averaged 2,800 to 3,300 miles per week with an annual income of $44,400.35.[65] As discussed below, Plaintiffs submitted declarations suggesting that England's instructors used a similar approach to convince trainees to abandon plans to become company drivers in favor of the Driving Opportunity.

David Bilbo, a former instructor and company driver, testified that England's policy was to promote aggressively the independent contractor program, and that classes were taught in a manner consistent with identical PowerPoint presentations.[66] Mr. Bilbo testified that England assigned him to teach a Business 101 class during the Phase I Upgrade, and that instructors were required to follow standard scripts and heavily rely on the England Business Guide.[67] Vickie Burr, a former orientation instructor, similarly testified that England "aggressively push[ed] the lease program on students from the very first days they are enrolled in school." [68]

During Phase II, trainees received training materials—Career Advancement Training Modules—that they were required to study and be tested on containing the same information found in the England Business Guide.[69] The trainees also spoke with train-

ers about the advantages of the independent contractor program. Internal records indicate that England may have understood that the long wait times for company trucks could be used to encourage drivers to sign up for the Driving Opportunity.[70] Additionally, during Phase II, trainees received only $0.12 per mile. According to Plaintiffs, economic realities of waiting for a truck during this period contributed to trainees' decisions to purchase the Driving Opportunity.

As late as 2011, Mr. Fife, an England vice president, informed Horizon employees that the goal was at least "80% conversion to the lease program . . . ." [71] Mr. Fife also provided a "talk track" or a script that highlighted the benefits of the independent contractor program.[72] He later testified that sales representatives used a standard script developed by the company "geared around overcoming objections, helping to clarify, answering questions, things of that nature." [73]

As discussed below, Defendants challenge Plaintiffs' assertions that trainees were forced to wait for company trucks, or that they received and relied on a uniform set of information during Phase I and Phase II training. Defendants cite to declarations of trainers and trainees they believe illustrate the range of drivers' experiences during training.[74]

### 6. England Business Guide

According to Plaintiffs, the England Business Guide "uniformly misrepresented mileage and income to the entire putative class

---

**65.** According to Plaintiffs, Mr. Fife testified that the numbers were not necessarily accurate in 2010. Plaintiffs also submitted the declaration of Robert Reeve, who worked as an operations manager. According to Mr. Reeve, England prioritized work for team drivers. In his experience, Mr. Reeve testified many solo independent contractors averaged 2,000 miles per week, although the goal was to push this number to 2,500 miles per week.

**66.** Dkt. 192 at 2–3.

**67.** Dkt. 192 at 3–4 ("The clear message of the England Business Guide and the Business 101 presentations was that lease drivers earned more money than company drivers.").

**68.** Dkt. 194 at ¶ 5 (describing orientation classes).

**69.** Dkt. 206 at 33–34 (citing Pla. Appx. at 3031 and 2027).

**70.** Pla. Appx. at 1049, 1052, 2424, 2435, 2541.

**71.** Dkt. 206 at 15 (citing Pla. Appx. at 1325).

**72.** *See* Pla. Appx. at 1325–27.

**73.** Dkt. 206 at Appx. at 3165 ("So we are all kind of singing from the same hymn book, if you will.").

**74.** *Infra* Background, Part III.C.; *see, e.g.,* Dkt. 246–12.

between November 2006 and at least July 2010."[75] Citing instructor testimony, Plaintiffs contend that the England Business Guide was heavily used during orientation and Business 101 presentations. And Defendants purportedly provided a copy of the England Business Guide to every trainee who reached the orientation stage.

The England Business Guide underwent several revisions each year.[76] In July 2010, Defendants replaced it with the Equinox Business Guide. The early versions of the Equinox Business Guide continued to make factual representations relevant to the class claims.[77]

According to Plaintiffs, every version of the England Business Guide and Equinox Business Guide between November 2006 and November 2010 contained three graphs. These graphs compared the projected income of independent contractors and company drivers. The graphs suggested that independent contractors traveled more miles and earned more income than company drivers. A caption to one of these graphs stated: "[Y]ou can see that 21% of independent contractors make more than $50,000 a year. Only 12% of drivers make that same amount." A separate caption explained: "This graph shows that independent contractors make more money, faster than company drivers do." Still another provided that independent contractors "average 33% more miles than company drivers do. More miles can equal more money." Plaintiffs argue that the information unrealistically reflected the experience of the average lease operator.[78]

Plaintiffs proffer internal emails and deposition testimony from which they contend a reasonable jury could find Defendants understood that the average income comparisons, the weekly mileage graph, and representations relating to the percentage of drivers with incomes exceeding $50,000 contained in the England Business Guide were false.[79] Based on their evaluation of England's internal data, Plaintiffs calculate that it would have been highly unlikely for a lease operator to reach the income levels reported in the England Business Guide.

In response, Defendants argue that reliance and interpretation of the graphs in the England Business Guide varied depending on the individual. According to Defendants, the graphs are subject to multiple interpretations. For example, Defendants maintain that the graph comparing the income earned by independent contractors and company drivers is subject to multiple interpretations because the text does not explicitly state that the graph reflects the average income of each group. Similarly, Defendants contend that the bar graph comparing miles driven raises an individual issue of fact because it would require an individual to understand how to read a bar graph and to assume that the graph reflected a guarantee. Finally, Defendants argue that the graph reflecting the percentage of independent contractors receiving in excess of $50,000 per year is not necessarily false, but instead depends on the data set.

Plaintiffs reply that the graphs are not subject to multiple interpretations.[80] Plaintiffs also reiterate that England misrepresented average mileage between February 2006 and October 2012 in every version of the England Business Guide, early versions of the Equinox Business Guide, the Driver Recruiting Information Guide, a publication called the Handbook Guide to Driver Recruiting, training presentations, brochures,

---

**75.** Dkt. 206 at 24.

**76.** Pla. Appx. at 1751 (listing England Business Guide versions and exhibit number).

**77.** Dkt. 206 at 24. Around this time, a separate England entity, Equinox Owner–Operator Solutions, purportedly assumed control of the Guide and Business 101 presentations.

**78.** Dkt No. 206 at 25–26 (discussing source of data).

**79.** For example, Josh England, who was vice president of the Independent Contractor Division, acknowledged during his deposition that the company could have updated its graphs. Plaintiffs also submit evidence that the information was included in the Career Advancement Training Modules, which trainees received during Phase II.

**80.** Dkt. 273 at 23–27.

and the website.[81]

## B. Experiences of Proposed Class Representatives

Roberts submitted a declaration in support of the Motion for Class Certification. Consistent with the allegations in the Third Amended Complaint, Roberts testified that he learned about the independent contractor and lease program from England's website and through conversations with England recruiters. In June 2009, Roberts attended training school. After receiving his commercial driver license, he attended orientation at an England facility, where he received the England Business Guide. During classroom instruction, Roberts heard instructors and representatives praise the independent contractor and lease program, which these representatives claimed allowed drivers to make more income than company employees. He testified he never received accurate information about failure or turnover rates.

Roberts began Phase I training in July 2009. After just over a month, he finished Phase I and attended Phase I Upgrade, where he signed the Student Training Agreement. Roberts testified that he always intended to become a company driver. As he participated in Phase II, Roberts operated under the expectation that he would become a company driver, but he received pressure from England to abandon this plan and enter the lease program. During this period, Defendants' representative indicated that trainees would have to wait to become company drivers and instructed Roberts to carefully study the England Business Guide.

Relying on representations in the England Business Guide and statements made during the training program suggesting that the average lease driver could be financially successful, Roberts ultimately signed both the Lease Agreement and the Operating Agreement. He testified he was charged $502 a week for a truck lease and also received certain other charges: (1) a fourteen cent-per-mile variable mileage charge, and (2) a seven cent-per-mile general reserve charge. Although he had believed England's income calculation and representations, Roberts testified that he did not make "much money" as an independent contractor, and some weeks even operated at a deficit to England. He stopped working as a lease driver in April 2010.[82]

McKay also provided a declaration describing his experiences as a lease driver. After learning about England via Google, McKay visited England's website, where he read that the company had a training program that could provide both a commercial driver license and a job. Shortly after submitting an online application, McKay received a telephone call from an England representative who confirmed that England guaranteed a job but did not inform McKay that a position as a company driver would likely be unavailable. Like Roberts, McKay testified that the recruiter did not mention the high turnover rates or the average length of employment for a lease driver.

McKay attended England's driving school in California in February 2009. His trainers provided him with a copy of the England Business Guide and instructed him to review it.[83] After completing Phase I, McKay signed England's Student Training Agreement in March 2009. According to McKay, the Student Training Agreement confirmed that he would be able to have a company driving position with a company truck at the completion of his training. As part of the Phase I Upgrade, McKay attended classroom presentations, where an England representative encouraged him and other drivers to become lease operators for England.

At the end of his Phase II training, McKay traveled to Salt Lake City, Utah. An England representative there informed him that no company jobs were available, but that he

---

**81.** According to Plaintiffs, Defendants consistently misrepresented average weekly mileage between 2,718 and 3,300. *See* Dkt. 273 at 25 and n.42 (citing source material).

**82.** He received his last settlement statement in June 2010.

**83.** McKay testified that he received the England Business Guide, version 5.2, which was dated February 2009.

could begin working immediately as a lease operator.[84] After waiting approximately a month, McKay abandoned his plan to become a company driver, agreed to become an independent contractor, and signed the Lease Agreement and Operating Agreement. McKay testified that he felt that he "had little choice but to enter the independent contractor program as a lease driver" in part because of England's representations about income and the availability of work.[85]

McKay leased one of Defendants' trucks for $567 per month. He testified that he also paid the variable mileage and general lease reserve charges, levied purportedly in part to cover the cost of "dispatching, load planning, paperwork, and other miscellaneous support services." [86] According to McKay, England never notified him of the accurate average income, tenure, or weekly mileage for lease drivers in the independent contractor program. If he had known of these facts, McKay would not have enrolled in the program. McKay stopped working as a lease operator in October 2009.

Plaintiffs also submit declarations from similarly-situated lease operators. For example, Carlos Cavezas testified about his recruitment and training in 2010, an experience that was substantially similar to that of McKay and Roberts.[87] Karen S. McClintic also testified that England recruiters enticed her into enrolling in a similar refresher course, where she was encouraged to become a lease operator.[88]

## C. Experiences of Other Drivers

Defendants contend that the uniformity described by Plaintiffs is without factual basis. Rather, Defendants argue that every applicant, trainee, independent contractor, and company driver made career decisions based on his or her individual needs and priorities.

Defendants support this position with a series of declarations from individual drivers who decided to attend England driving school based on equipment selection, recommendations from personal acquaintances, the company's safety record, the opportunity to work a dedicated route, or other reasons separate from England's website or representations about income or miles available to independent contractors.[89] In Defendants' view, these individuals chose to become independent contractors for reasons distinct from any job guarantee or recruitment efforts.[90]

Similarly, Defendants submit declarations in which drivers testify that England gave them the option to become company drivers.[91] Some of these drivers testify that they never intended to become company drivers. Others testify that England allowed them to become company drivers. And England submitted evidence that at least 12,500 individuals became company drivers after completing Phase II training since January 2008.[92]

Defendants argue that questions about whether trainees received sufficient time to consider the Leasing Agreement and Operating Agreement necessarily require consideration of highly individualized evidence. Under this theory, individuals chose to lease from

---

**84.** Plaintiffs provide internal England documents, which they contend suggest that company trucks were available. Dkt. 206 at Appx. at 1317, 4219–21.

**85.** Defendants challenge this assertion by a copy of McKay's Phase II Upgrade Planning Sheet and his driving records. Both suggest that McKay decided to become an independent contractor and worked as a trainer shortly after arriving in Utah. *See* Dkt. 245 at 17–18.

**86.** According to a company newsletter, the variable mileage charge was used "to partially cover the cost of the truck, acquisition of freight, support staffing, and other business expenses." Dkt. 101, Ex. D.

**87.** Dkt. 198.

**88.** Dkt. 203.

**89.** *See, e.g.,* Dkts. 246–4, 246–5, 246–7, 246–9, 246–11, 246–15, 246–16, 246–17.

**90.** Defendants' declarants often describe their reasons for selecting England's driver training schools. These reasons varied, and included as examples the cost of comparable programs, convenience, and word of mouth.

**91.** *Compare* Dkt. 245 at 15, *with* Dkt. 273 at 6–18.

**92.** Dkt. 246–31. Defendants also submit declarations in support of the proposition that many drivers did not wait lengthy periods of time for a company truck.

Horizon for a variety of reasons, including whether or not the leasing company required a down payment or whether the driver had a qualifying credit rating. According to Defendants, the plain terms of the Leasing Agreement and Operating Agreement put drivers on notice of their options and obligations. Several declarants testify that they spent days reviewing the agreements before committing to the independent contractor program.

Finally, Defendants contend that trainees chose to become independent contractors for reasons distinct from of the alleged uniform misrepresentations. For example, several former trainees state they were unaware of the misrepresentations, chose to become independent contractors for reasons completely unrelated to the misrepresentations, or knew of the actual income or mileage of the average independent contractor but nevertheless chose to enter the program. Several of these trainees testify that they heavily relied on representations by trainers. According to Defendants, these trainers did not follow a uniform script but instead tailored the training program to the individual trainees. Several of Defendants' declarants state that they did not rely on the England Business Guide in making their decisions, or that they can no longer remember reviewing or thinking about the graphs contained in the England Business Guide.[93]

Plaintiffs challenge Defendants' declarations. According to Plaintiffs, the declarants are unrepresentative of the proposed class. Plaintiffs contend that Defendants cherrypicked twenty-eight drivers whose timing or circumstances were unique from the thousands of individuals who were the subject of a campaign of uniform misrepresentations and elected to purchase the Driving Opportunity. To support this proposition, Plaintiffs analyze each of the declarants and identify distinguishing features, which include: (1)

the declarant's entry into the independent contractor program after Defendants discontinued the England Business Guide or other misrepresentations, (2) the fact that a declarant transitioned out of the Driving Opportunity, worked as a company driver, or belonged to a minority of drivers who received "Dedicated" routes, or (3) an argument that the declarant never belonged to the proposed class.[94]

Plaintiffs contend that only nine of the declarants purchased the Driving Opportunity during the relevant time period. According to Plaintiffs, four of these fall into the minority of independent contractors who received guaranteed mileage from a dedicated route, while three transitioned to the lease-purchase program. Of the remaining two drivers, one received extra mileage by working as a trainer, while the other driver earned only $322 per week. Finally, in response declarations Defendants submitted relating to recruitment and training, Plaintiffs point to internal company records, training manuals, presentation materials, trainer guidelines, and trainer compensation, all of which may suggest that Defendants and the trainers themselves understood the importance of conveying a positive and uniform message about the value of the independent contractor program.

### D. Driving Opportunity

As discussed above, the Driving Opportunity rests at the heart of this case. To Plaintiffs, the Driving Opportunity consisted of the Leasing Agreement and the Operating Agreement, both of which were signed by the proposed class members in Salt Lake City, Utah or Burns Harbor, Indiana. Discovery responses suggest the majority of the proposed class entered into the Driving Opportunity in Utah. In exchange for the Driving Opportunity, drivers leased a truck from Horizon for at least $450 per week. They also

---

**93.** *See, e.g.,* Dkt. 245 at 26–29 (summarizing testimony). Defendants' efforts to distinguish the majority of these drivers were not always persuasive. For example, the fact that an individual became a company driver, transitioned to the owner-operator program, or received a dedicated route does not diminish the relevance of descriptions of reasons for selecting an England school,

experiences during the training program, and exposure to the purported misrepresentations.

**94.** *See* Dkt. 273 at 6–18 (discussing distinguishing features of each of Defendants' declarants based on the declaration and internal company records).

paid variable costs for fuel, insurance, permits, and maintenance.

Despite England's income comparisons and projections, the average annualized income of a solo lease operator amounted to from about $17,000 to $21,000 per year, depending on the division in which the driver worked. Plaintiffs contend that Defendants' internal documents show that one in five drivers earned nothing in any given week. Citing testimony, Plaintiffs maintain the difference between a company driver and a lease operator was that the latter experienced high costs, low pay, and insufficient mileage. Unlike company drivers, lease operators had to cover lease payments, fuel, insurance, taxes, truck maintenance, and permits. These costs, in turn, reduced a lease operator's net income.

Although the parties dispute the inferences to be drawn from the data, there is evidence at this point suggesting that Defendants were aware they were making misrepresentations, but continued to make them. For example, an internal study indicated that company drivers made more than lease operators for the same mileage in 2012.[95] And before 2012, internal correspondence suggests that England's executives knew the number of projected miles for a lease operator was less than represented to trainees. In June 2010, Horizon Director Bud Pierce wrote to Michael Fife and informed him that the wage for an independent contractor "averages less than a Company driver without the opportunity for benefits."[96] In October 2010, an employee emailed Chad England to inform him that "[t]he likelihood of [lease operator] solo drivers averaging 2,800–3,000 miles is no longer a reality."[97] In March 2011, an employee in England's Independent Contractor Division expressed concerns to Josh England and Michael Fife about misrepresentations in the company's advertisements.[98] In November 2011, a director at the Burns Harbor location informed a group of executives that "[t]he solo model is broken and needs to be fixed. Breakeven for a solo [lease operator] is 1,800 and the average [lease operator] gets barely above that."[99] Similarly, records suggest that England was aware of high turnover rates for lease operators but failed to disclose the information during initial recruitment or the training program.[100]

## E. Uniformity

As indicated above, Plaintiffs submitted declarations illustrating a uniform scheme and uniform experience. Defendants submitted declarations suggesting a diversity of experiences among potential class members. In short, the parties hotly contest whether England uniformly made misrepresentations and whether drivers uniformly relied on the alleged misrepresentations to their detriment. Two additional observations relating to uniformity are worth noting.

Defendants contend that representations changed over time. For example, Defendants discontinued the England Business Guide in 2010, removed pro formas from their websites in 2012, and deleted the alleged misrepresentations from Horizon's brochures in 2012. England contends that it removed mileage and income estimates from recruiting guides in 2013.

Defendants maintain that there was no uniform distribution or receipt of representations to potential independent contractors. Here, Defendants rely on the testimony of both company drivers and independent contractors. Some testified they could not remember a particular representation. Others indicated that they became independent contractors for reasons independent of the misinformation Plaintiffs identified.

95. Dkt. 206 at 38 (citing Pla. Appx. at 1129, 3019–20).

96. Pla. Appx. at 1634–35 ("Accordingly, the IC must be a trainer or team to financially survive.").

97. Pla. Appx. at 4168.

98. Pla. Appx. at 2449 ("We are currently advertising 3000 [sic] miles per solo [independent contractor]. Our average is 1891 [sic].").

99. Pla. Appx. at 4158.

100. In 2010, for example, weekly turnover rates for one division reached 209.88%. (Dkt. 206 at 45–46.)

Plaintiffs respond that Defendants made a series of uniform misrepresentations throughout the class period using different mediums. Citing the England Business Guide, the Handbook Guide to Driver Recruiting, the Driver Recruiting Information Guide, brochures, Business 101 instruction materials, and pro formas from the website, Plaintiffs contend Defendants consistently misrepresented that independent contractors averaged between 2,718 and 3,300 miles per week between 2006 and 2012, despite internal communications between executives that suggests they understood the mileage predictions were inconsistent with reality.[101] Similarly, Plaintiffs cite to brochures, graphs, and recruiter materials for the proposition that Defendants uniformly misrepresented the income of an independent contractor.[102]

## F. Turnover Rates

The parties dispute the inferences that should be drawn from high driver turnover. To Plaintiffs, high turnover suggests culpability. In their view, Defendants could have informed driving school applicants of high turnover rates and told trainees about the relatively high percentage of independent contractors who quickly left England's program and abandoned their Horizon leases.

Defendants respond that high turnover is endemic to the trucking industry, where drivers face unique challenges, including long stretches of time alone on the road and away from home. Defendants maintain that recruits and trainees knew of high turnover rates in the industry but nevertheless decided to take the risk and enter the independent contractor program. Defendants also argue that an independent contractor might leave the program for a variety of reasons, many of which are unrelated to mileage or income.[103]

Similarly, the parties dispute whether success or failure in the independent contractor program was driven by a systemic flaw or individual performance. Citing declarations of drivers, Defendants contend that success

hinged on each driver's: (1) willingness to minimize time at home, (2) habit of making timely deliveries, (3) fuel efficiency and costs, (4) trip planning, and (5) decision to drive solo or in a team. To Defendants, each of these factors bore a relation to an independent contractor's weekly and annual income, which in turn drove individual success in the program.

## G. OWNRRE Database

The parties dispute the extent to which damages can be determined on a class-wide basis. This dispute centers on the contents and use of a set of data obtained from England. The parties refer to the data set as the OWNRRE database.

The OWNRRE database has sets of data for each independent contractor. Among other things, OWNRRE contains mileage information, gross revenue, net payments to each lease operator, and an accounting of fixed and variable costs charged to each lease operator under the Driving Opportunity.

England contends that OWNRRE does not have sufficient information for an accurate calculation of damages for three reasons. First, Defendants argue the raw data is limited because it gives no indication of individual choices affecting a driver's income, such as fuel efficiency or trip planning. Second, Defendants question whether an expert could calculate damages based on OWNRRE data, when it does not indicate which representation a driver relied on when making the decision to become an independent contractor. Third and finally, Defendants contend OWNRRE does not provide enough information to demonstrate injury-in-fact.

## IV. FACTS RELATING TO CHOICE OF LAW

In the motions for class certification and partial summary judgment, the parties ask the court to determine whether Utah law applies to Plaintiffs' claims. There are minor disputes over the inference to be drawn from or the weight given to a particular fact, but

---

**101.** Dkt. 273 at 31–34.

**102.** Dkt. 273 at 34–37. The projected income ranged from $33,158.85 to $52,802.66, depending on the source.

**103.** Dkt. 245 at 42–44 (citing as examples family priorities, better job offers, safety violations, or completion of leasing program).

the parties generally do not dispute the following facts relevant to choice of law.

This case involves considerable contacts with both California and Utah. Plaintiffs lived in California when they learned about England's driver training schools, and attended England's training school in California. Both used Eagle Atlantic Financial Services, Inc. to finance their tuition while in California. They relied, at least in part, on recruiters' representations about the independent contractor program while completing training in California. And although he traveled across the country for England, Roberts based his work as an independent contractor out of California.

But Utah also bears a significant relationship to this litigation. Both the Leasing Agreement and Operating Agreement Plaintiffs signed provide that Utah law will govern the interpretation of the agreements, stating that they "shall be interpreted under the laws of the United States and the State of Utah, without regard to the choice-of-law rules of such State or any other jurisdiction." [104]

Additionally, England and Horizon are incorporated in Utah. Defendants' recruiters contacted prospective drivers from Utah. According to Plaintiffs, Defendants created content for websites and public recruiting materials in Utah. Moreover, although the parties dispute the uniformity of the representations in the training program, there is some evidence that the script used by recruiters and trainees was developed by executives from Defendants' headquarters in West Valley City, Utah. And while students and trainees received the alleged misrepresentations at training locations throughout the country or on the road during training, Plaintiffs proffer evidence that Defendants developed and oversaw the independent contractor program, the training program, and the Driving Opportunity in Utah. Plaintiffs traveled to Utah, where they and a majority of the proposed class members attended Business 101 presentations and purchased the Driving Opportunity.[105] Finally, Defendants appear to have calculated settlement statements and managed leases for independent contractors from Utah." [106]

## ANALYSIS

### I. MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS (DKT. 189)

Defendants move pursuant to Rule 12(c), Federal Rules of Civil Procedure, for judgment on the pleadings on four of Plaintiffs' claims for relief. These claims allege violations of: (1) the Racketeer Influenced and Corrupt Organizations Act (RICO), (2) Utah's Pattern of Unlawful Activity Act (UPUAA), (3) California's Seller Assisted Marketing Plan Act, and (4) California's Unfair Competition Law.[107] Plaintiffs do not contest Defendants' motion for the claims arising under California statutes.[108] Accordingly, Plaintiffs' Third and Fourth Claims are dismissed with prejudice. The issue remaining is whether the court should grant judgment on the pleadings in favor of Defendants on the RICO and UPUAA claims.

### A. Standard for Judgment on the Pleadings

 Courts in the Tenth Circuit are instructed to apply the "same standard when

---

**104.** Dkt. 101–8 (Leasing Agreement) at ¶ 21, *Dispute Resolution*; and Dkt. 101–5 (Operating Agreement) at ¶ 18, *Dispute Resolution*. The Dispute Resolution paragraphs in both the Leasing Agreement and Operating Agreement also contain an identical forum selection clause providing that "ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT ... SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING SALT LAKE CITY, UTAH, WITHIN TWO YEARS OF THE ACCRUAL OF SUCH CLAIM OR DISPUTE." *Id.*

**105.** Defendants do not dispute that independent contractors were required to sign the Leasing Agreement in Utah or Indiana during the class period.

**106.** According to Plaintiffs, England's Independent Contractor Division was based in Utah and handled "everything from signing contracts with new drivers coming in, carriers, the final settlements, the maintenance, and then just every day phone calls from our drivers." Dkt. 273 at 39 (quoting Pla. Appx. at 7632–33).

**107.** Dkt. 189.

**108.** Dkt. 211 at 7 n.3.

evaluating 12(b)(6) and 12(c) motions." [109] Under this standard, the court assumes the truth of all well-pleaded allegations and provides the nonmovant the benefit of any reasonable inferences from the pleadings.[110] A court evaluating a Rule 12(c) motion may not "weigh potential evidence that the parties might present at trial," but instead should restrict its analysis to whether the "complaint alone is legally sufficient." [111] Documents and exhibits attached to the complaint are considered as part of this analysis.[112] "A motion for judgment on the pleadings 'should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.' " [113]

For purposes of this motion, Defendants stipulated to the facts alleged in the Third Amended Complaint, but nevertheless contend they are entitled to judgment in their favor because Plaintiffs fail to allege a distinction between the liable persons and the alleged enterprise, as required under cases interpreting the relevant RICO provision. According to Defendants, this line of reasoning should also result in judgment on Plaintiffs' UPUAA claim.

Assuming the truth of all factual allegations contained in the Third Amended Complaint and drawing all reasonable inferences in favor of Plaintiffs, the court concludes that Defendants are entitled to judgment on Plaintiffs' RICO and UPUAA claims for the reasons stated below.

## B. Standard for Plaintiffs' RICO Claim

The RICO statute makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." [114] Interpreting the statute, federal courts have held that "the defendant 'person' must be an entity distinct from the alleged 'enterprise.' " [115] Although courts derive the requirement from the statutory language, the distinctness inquiry is often informed by two considerations. On the one hand, courts have expressed concern about the original purpose of RICO [116] and the negative effects that could arise out of an unwarranted extension of the statute into otherwise lawful commercial relationships.[117] Second, courts express concern that defendants might escape RICO liability merely by adopting a particular corporate structure.[118] At times, these considerations conflict.

For example, in *Brannon v. Boatmen's First National Bank*,[119] the Tenth Circuit concluded that the plaintiffs could not proceed on a claim arising under § 1962(c). The plaintiffs alleged the defendant, a subsidiary, participated in an enterprise consisting of its parent corporation. The Tenth Circuit held that merely alleging participation within a corporate structure was not enough to satisfy the distinctness requirement because a "parent corporation, as a matter of corporate reality, is nothing more than the controlling

---

**109.** *Brown v. Montoya*, 662 F.3d 1152, 1160 n.4 (10th Cir. 2011) (citation omitted) (internal quotation marks omitted); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).

**110.** *See Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000).

**111.** *See Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).

**112.** *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

**113.** *Adams v. Jones*, 577 Fed.Appx. 778, 782 (10th Cir. 2014) (quoting *Park Univ. Enters., Inc.*, 442 F.3d at 1244).

**114.** 18 U.S.C.A. § 1962(c).

**115.** *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001) (quoting *Brannon v. Boatmen's First Nat'l Bank*, 153 F.3d 1144, 1146 (10th Cir. 1998)); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (agreeing requirement of "some distinctness between the RICO defendant and the RICO enterprise" was "legally sound and workable").

**116.** *See, e.g., Cedric Kushner*, 533 U.S. at 163–64, 121 S.Ct. 2087.

**117.** *See, e.g., Brannon*, 153 F.3d at 1147.

**118.** *See, e.g., McCullough v. Suter*, 757 F.2d 142, 143–44 (7th Cir. 1985).

**119.** 153 F.3d 1144 (10th Cir. 1998).

484

shareholder of a subsidiary."[120] The court noted that "expanding RICO liability because of a business organization choice makes little sense from a policy perspective."[121] Because RICO applies only where the defendant participates in the "enterprise's affairs, *not just its own affairs*,"[122] the Tenth Circuit held the plaintiff had alleged nothing more than a "legitimate corporate and financial relationship between [the defendant] and its holding company," which was insufficient under RICO.[123]

The *Brannon* decision must be considered in light of *Cedric Kushner Promotions, Ltd. v. King*.[124] In *Cedric Kushner*, the Supreme Court adopted the distinctness requirement but nevertheless held that a corporation's sole owner was "a natural person, distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."[125] In passing, the Supreme Court referenced an analogous decision in the Seventh Circuit in which Judge Posner observed that formal or practical separation between a corporate entity and its sole proprietor satisfied the distinctness requirement.[126] Still, the Court declined to address the merits of cases in which lower courts dismissed claims where plaintiffs alleged that a "corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'"[127] According to the Court, these cases were distinguishable.[128]

In each of these decisions, three terms feature prominently: person, enterprise, and association-in-fact. RICO defines person as "any individual or entity capable of holding a legal or beneficial interest in property."[129] Enterprise means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[130] Although not expressly defined by statute, an association-in-fact becomes an enterprise when it has "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose."[131] Stated differently, courts have defined an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct."[132]

## C. Analysis of Plaintiffs' RICO Claim

Plaintiffs allege in the Third Amended Complaint that England, Horizon, and the drivers who serviced England's customers constituted an association-in-fact enterprise, which Plaintiffs refer to as the "England Truck Leasing Enterprise."[133] According to Plaintiffs, England and Horizon used the England Truck Leasing Enterprise to fraudulently induce Plaintiffs and thousands of other drivers into signing up for the

120. *Id.* at 1147.

121. *Id.*

122. *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)) (internal quotation marks omitted) (alteration in original).

123. *Brannon*, 153 F.3d at 1148; *see also Bd. of Cnty. Comm'rs of San Juan Cnty. v. Liberty Grp.*, 965 F.2d 879, 885 (10th Cir. 1992) ("[A] separate enterprise is not demonstrated by the mere showing that the corporation committed a pattern of predicate acts in the conduct of its own business.").

124. 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001).

125. *Id.* at 163, 121 S.Ct. 2087.

126. *Id.* (citing *McCullough v. Suter*, 757 F.2d at 144). The Court's citation signal suggests that *McCullough* was analogous but one step removed from the question presented in *Cedric Kushner*.

127. *Id.* (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)).

128. *Id.*

129. 18 U.S.C.A. § 1961(3).

130. *Id.* § 1961(4).

131. *Boyle v. United States*, 556 U.S. 938, 956, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

132. *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

133. Dkt. 101 at ¶ 115.

Driving Opportunity.[134] Plaintiffs further allege that they and other drivers in the proposed class were subject to the control of Defendants.[135] The drivers allegedly participated in the England Truck Leasing Enterprise's common purpose "of providing services necessary to the safe, timely, and effective transportation of goods." [136] Finally, Plaintiffs allege that England and Horizon are alter egos. In support of this legal theory, Plaintiffs allege the companies had overlapping ownership, management, and finances.

The central issue here is whether Plaintiffs have alleged an enterprise separate and distinct from Defendants themselves. This involves two sub-issues. First, the parties dispute whether the drivers should be excluded from the enterprise if they are either victims or agents of Defendants. Second, assuming drivers cannot be included in the enterprise, the parties contest whether Plaintiffs satisfy the distinctness requirement, especially where the Defendants are alleged to belong to the same corporate family. The court addresses these issues in turn.

1. The Relationship Between Drivers and the Enterprise

Defendants argue the drivers cannot be included in the defined enterprise because victims or agents of a corporation should be excluded from an association-in-fact enterprise. Plaintiffs contend that the England Truck Leasing Enterprise includes the drivers, and that this satisfies the distinctness requirements. Although the parties cite to a wealth of authority in their papers, two decisions were particularly helpful in illustrating the issue presented.

The first is an unpublished Tenth Circuit Court of Appeals decision: *Dirt Hogs Inc. v. Natural Gas Pipeline Co. of America.*[137] In *Dirt Hogs*, a construction company sued a pipeline company. The construction company alleged the existence of an association-in-fact enterprise consisting of the pipeline company, its management, a corporate codefendant, and some of the construction company's employees.[138] The court of appeals affirmed dismissal of the complaint, in part because the enterprise was "nothing more than another name for Natural and its agents, conducting the corporation's business." [139] In reaching this conclusion, the court recognized that other courts had "pierced through the allegations in a complaint to hold that the alleged enterprise is not distinct from its defendant participants." [140] Applying that approach, the court excluded victims from the purported enterprise and held that the construction company was unable to prove a distinct person and enterprise.[141]

The second instructive case is *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*[142] In *Riverwoods*, the Second Circuit held plaintiffs could not circumvent the distinctness requirement "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." [143] Because "a corporation can only function through its employees and agents [an enterprise composed of itself and its agents] is in reality no more than the defendant itself." [144] Applying this principle, the Second Circuit affirmed dismissal of a claim in which the defendant was alleged to have engaged in an association-in-fact enter-

---

134. *Id.* at ¶¶ 123–32.

135. *Id.* at ¶ 118.

136. *Id.* at ¶ 120.

137. No. 99–6026, 2000 WL 368411 (10th Cir. Apr. 10, 2000).

138. *Id.* at 2–3.

139. *Id.* at 3.

140. *Id.* at 3.

141. *Id.* (quoting *Riverwoods*, 30 F.3d at 344).

142. 30 F.3d 339 (2d Cir. 1994).

143. *Id.* at 344 (citing decisions in the First, Third, Fourth, and Tenth Circuits).

144. *Id.* ("Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.").

prise with two of its own employees.[145]

■ While recognizing that federal courts have been divided in their treatment of agents and victims, the court ultimately concludes the reasoning of *Dirt Hogs* and *Riverwoods* is persuasive. Applying the reasoning of these cases, Plaintiffs here cannot satisfy the distinctness requirement by alleging that drivers participated in the England Truck Leasing Enterprise for two independent reasons: (1) although independent contractors, the drivers acted subject to Defendants' control; and (2) the drivers were the alleged victims. Under either approach, the drivers are not properly considered part of the enterprise for the purposes of the RICO distinctness analysis.

■ First, the drivers' participation in the enterprise was subject to Defendants' control.[146] In this respect, any shared common purpose or conduct connecting a driver to the enterprise was limited to acts done in the capacity of an agent. As in *Riverwoods* and *Dirt Hogs*, Plaintiffs may not circumvent the statutory requirement of a distinct person and enterprise by adding an agent or employee to the definition of enterprise.[147] Similar to the subsidiary-parent corporation in *Brannon*, a corporation—such as England or Horizon—necessarily conducts business through agents, employees, and at times independent contractors.[148] If a party could simply add an employee or agent to the definition of enterprise to survive a dispositive motion, as Plaintiffs attempt to do here, it would render meaningless the language of

§ 1962(c) and the distinctness requirement. Indeed, it is hard to see how any entity would escape this sweeping interpretation of RICO in a suit involving alleged wrongdoing. For similar reasons, courts have traditionally "excluded this far-fetched possibility by holding that an employer and its employees cannot constitute a RICO enterprise." [149] The court sees no reason this principle should not apply with equal force to an independent contractor whose leasing opportunities and employment were expressly limited to and defined by the England Truck Leasing Enterprise.

Second, the court concludes that the drivers, as the primary victims of the alleged fraud, can hardly be characterized as members of the enterprise. Although the decision is unpublished, the Tenth Circuit appears to have recognized that the weight of authority and sound policy weigh in favor of excluding victims when evaluating whether named defendants are distinct from the enterprise, at least in some cases.[150] Here, as in *Dirt Hogs*, Plaintiffs seek to add victims to the definition of enterprise in order to satisfy distinctness. Although RICO "protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protects the public" from persons who unlawfully use illegitimate enterprises,[151] Plaintiffs have not cited to persuasive authority for the proposition that this general principle requires a court to lump together victims with corporate entities when evaluating distinctness under

145. *Id.*

146. Dkt. 101 at ¶¶ 65, 66, 73–74, 117–18, and 120.

147. The following cases were also persuasive: *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994); *Bd. of Cnty. Comm'rs of San Juan Cnty. v. Liberty Grp.*, 965 F.2d 879 (10th Cir. 1992); and *In re Ellipso, Inc.*, No. 09–00148, 2011 WL 482725 (Bankr. D.D.C. Feb. 7, 2011). Cf. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013).

148. *Brannon v. Boatmen's First Nat. Bank of Okla.*, 153 F.3d 1144, 1147 (10th Cir. 1998) (holding plaintiff failed to establish distinctness between parent corporation and its subsidiary);

see also *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *judgment vacated on other grounds*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

149. *Fitzgerald*, 116 F.3d at 226 (citing cases in the Second and Third Circuit); *cf. Cedric Kushner*, 533 U.S. at 164, 121 S.Ct. 2087 (declining to foreclose distinctness analysis in *Riverwoods* and similar cases).

150. *Dirt Hogs Inc. v. Natural Gas Pipeline Co. Am.*, No. 99–6026, 2000 WL 368411, at *3 & n.3 (10th Cir. Apr. 10, 2000).

151. *Cedric Kushner*, 533 U.S. at 164, 121 S.Ct. 2087 (citations omitted).

RICO.[152] Indeed, courts before and after *Cedric Kushner* and *Boyle* have declined to include victims as part of the enterprise because victims could hardly have shared a common purpose with as association designed to defraud them.[153] For these reasons, the court concludes that Plaintiffs' RICO claim cannot survive Defendants' motion by relying on allegations that drivers who were also purported victims belonged to the England Truck Leasing Enterprise.

In response to Defendants' motion, Plaintiffs produce litanies of case citations.[154] After careful review, the court concludes the majority of these cases: (1) are distinguishable because the enterprise included more than victims or agents, (2) fail to squarely address the issue presented in this case,[155] or (3) are unpersuasive.[156]

For all of these reasons, the court concludes Plaintiffs fail to satisfy RICO's distinctness requirement by alleging drivers— either as victims or agents—belong to the enterprise.

## 2. England and Horizon as Persons and Enterprise

Defendants further contend the Third Amended Complaint independently fails to allege a separate and distinct person and enterprise because Plaintiffs themselves allege England and Horizon belong to a single corporate family. In response, Plaintiffs contend that England and Horizon are distinct from the enterprise because the companies are practically and formally distinct from one another.

▮ RICO cases are often factually complex, so it is perhaps unsurprising that treatment of this issue has been varied. The Sixth Circuit recently characterized the case law before and after *Cedric Kushner* as "meandering and inconsistent." [157] Despite conflicting holdings and outcomes, courts have routinely recognized two general principles. First, "individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf." [158] Second, corporate defendants are distinct from the enterprise when the corporations themselves are sufficiently distinct.[159] Given the complexity of the issue and the wealth of cases cited by both parties, further discussion of the significant cases helpfully illustrates the contours of the issue presented.

---

**152.** The court rejects Plaintiffs' argument that *Boyle*'s general discussion of the elements of an association-in-fact enterprise forecloses the analysis of distinctiveness in the Tenth Circuit's *Dirt Hogs* decision.

**153.** *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013); *Dirt Hogs*, 2000 WL 368411, at *3 n.3; *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 267 (3d Cir. 1995).

**154.** Dkt. 211 at 22–25.

**155.** Plaintiffs devote a substantial portion of their briefing to the Supreme Court's *Boyle* decision, which reiterated the definition for association-in-fact enterprises. But *Boyle* neither discussed nor resolved the question presented here, which is whether a party satisfies the distinctiveness requirement by including with a corporate entity an individual who acted on behalf of the enterprise or suffered as its victim. Similarly, Plaintiffs' interpretation of *Cedric Kushner* is unpersuasive because the Supreme Court: (1) adopted the distinctness requirement, (2) contrasted its holding with *Riverwoods* and other cases which involved corporate persons, and (3) described the case at hand as "a claim that a corporate employee is the 'person' and the corporation is the 'enterprise.'" *Cedric Kushner*, 533 U.S. at 164, 121 S.Ct. 2087.

**156.** For example, Plaintiffs cite to *In re National Western Life Insurance Deferred Annuities Litigation*, 467 F.Supp.2d 1071 (S.D. Cal. 2006). But *National Western Life* is factually distinguishable and legally unpersuasive insofar as the case involved corporate entities besides the defendants and applied a relaxed distinctness analysis inconsistent with the views expressed in the Tenth Circuit's *Brannon* and *Dirt Hogs* decisions.

**157.** *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013).

**158.** *Id.* (relying on *Cedric Kushner*).

**159.** As discussed below, courts have applied slightly different tests to corporate entities. *See, e.g., id.* (applying functional test); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (evaluating corporate structure); *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1149 (10th Cir. 1998) (quoting "single corporate consciousness" language).

The Second Circuit considered a similar issue in *Discon, Inc. v. NYNEX Corporation*.[160] In *Discon*, a telephone removal service company sued a group of telephone companies under § 1962(c).[161] The service company identified an enterprise coextensive with the named defendants, which in turn included a holding company and two wholly owned subsidiaries.[162] The Second Circuit held the RICO claim was properly dismissed because the service company failed to allege a distinct "person" and "enterprise."[163] Citing earlier precedent, the court noted that a party may be able to assert a claim against a defendant who belonged to an enterprise composed of separate legal entities.[164] But the court ultimately held that a party may not assert a § 1962(c) claim against a group of defendants coextensive with the enterprise when the legal entities acted "within the scope of a single corporate structure, guided by a single corporate consciousness."[165] The court expressed particular concern that it "would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated."[166] In *Brannon*, the Tenth Circuit relied in part on *Discon* when it held that a party failed to state a RICO claim against a subsidiary of a parent corporation alleged to be the enterprise.[167]

At the same time, courts have not uniformly applied the principle articulated in *Discon*. Some courts have adopted bright-line rules for particular factual contexts. For example, the Seventh Circuit held that an individual was distinct from a sole proprietorship, in part because the proprietorship was a separate legal entity and may have employed other individuals.[168] Similarly, in an unpublished decision, the Tenth Circuit held that a bankruptcy estate was distinct from the debtor because the estate was "a legally different entity with different rights and responsibilities due to its different legal status."[169] A court in this district held an attorney was distinct from an enterprise comprised of the individual's sole proprietorship, in part because the attorney may have associated with others attorneys.[170]

Still other decisions appear to be bound by their facts or motivated by particular policy considerations. For example, in *United States v. Goldin Industries, Inc.*,[171] the Eleventh Circuit evaluated the criminal convictions of three family-owned scrap metal disposal businesses. On appeal, the defendant companies cited *Discon* for the proposition that the government failed to show that the corporate persons were distinct from the enterprise. The government responded that the entities were distinct from an association-in-fact composed of the three corporate defen-

---

160. 93 F.3d 1055 (2d Cir. 1996).

161. *Id.* at 1057–58.

162. *Id.* at 1057, 1063.

163. *Id.* at 1063–64.

164. *Id.* at 1063 (citing *Cullen v. Margiotta*, 811 F.2d 698 (2d Cir. 1987)).

165. *Id.* at 1064.

166. *Id.* (excluding unnamed agents and employees from an enterprise "so long as those persons act on behalf of the corporation"); *see also Cruz*, 720 F.3d at 121 (barring claim where members of enterprise were "alleged to operate as part of a single, unified corporate structure and are, as such, not sufficiently distinct to demonstrate the existence of a RICO enterprise").

167. *Brannon*, 153 F.3d at 1149 (using "unified corporate structure" and "single corporate consciousness" language).

168. *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) ("The only important thing is that it be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization) separable from the individual.").

169. *Ad-X Int'l, Inc. v. Kolbjornsen*, 97 Fed.Appx. 263, 266 (10th Cir. 2004) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)).

170. *Wade v. Gaither*, 623 F.Supp.2d 1277, 1288 (D. Utah 2009) (discussing treatment of sole proprietorships); *but see Wood v. World Wide Ass'n of Specialty Programs & Sch., Inc.*, No. 2:06–CV–708, 2011 WL 3328931, at *5 (D. Utah Aug. 2, 2011) (concluding plaintiff failed to allege distinct person and enterprise, where the association-in-fact was composed of the named defendants).

171. 219 F.3d 1271 (11th Cir. 2000).

dants and four individuals. Noting that a defendant could be both a person under RICO and a participant in an enterprise,[172] the Eleventh Circuit distinguished *Discon* and held that each defendant was a "separate and distinct corporation[,] incorporate[d] in a separate state[, and] a separate ongoing business with a separate customer base." Because each was "free to act independently and advance its own interests contrary to those of the other two corporations," the defendants were distinct from an association composed of all three corporations.[173]

The Second Circuit used a similar analysis in *Securitron Magnalock Corp. v. Schnabolk*.[174] In *Securitron*, a manufacturer sued an individual and two of his companies. After finding the enterprise consisted of the defendants, the jury awarded damages under § 1962(c).[175] On appeal, the defendants argued that the manufacturer could not prove his RICO claim because the defendants were not distinct from the enterprise.[176] The Second Circuit disagreed, holding that even though the individual defendant participated as an officer or agent of the corporation, each corporation was a separate legal entity that could combine to form a distinct enterprise.[177] In its analysis, the court specifically noted that each corporation was engaged in "distinct lines of business" and there were two "active, ongoing businesses rather than two stacks of stationery." [178]

■ Although different in degree, most of the decisions cited by Plaintiffs and England can be distinguished from the instant dispute. This case is distinguishable from suits involving a single defendant and an enterprise composed of additional, separate legal entities. Yet this case also appears to differ from suits where the enterprise consists only of the named defendants, with each partici-

pating in the enterprise as a clearly distinct legal entity. Finally, unlike *Brannon*, this case does not involve a parent company and its subsidiaries. And after reviewing the cases cited by both parties, the court concludes the RICO claim pled in Plaintiffs' Third Amended Complaint presents an issue of first impression in the Tenth Circuit. Specifically, neither the Tenth Circuit nor the Supreme Court has resolved whether an association-in-fact enterprise composed of corporate entities is distinct from the corporate entities, as persons, where a plaintiff alleges both entities belong to a single corporate family and seeks to recover against each under an alter ego theory.[179]

■ After studying the factual allegations in the Third Amended Complaint and analogous authority, the court concludes the facts Plaintiffs allege fail to establish a distinct person and enterprise. Assuming the truth of Plaintiffs' allegations, England and Horizon are alter egos of one another.[180] Indeed, Plaintiffs specifically allege the companies have a "unity of ownership, share officers and directors, comingle funds, share a common computer system and office space, and, under the facts presented herein, it would be unjust and inequitable to treat them as separate entities." [181] In this respect, Plaintiffs' factual allegations make this case analogous to *Discon* and distinguishable from *Goldin Industries* and *Securitron*. Plaintiffs contend England and Horizon acted "as a single corporate structure, guided by a single corporate consciousness." [182] Acting with a single corporate consciousness, Defendants could hardly "associate[ ] with any enterprise" that consisted of an identical, coexten-

172. *Id.* at 1275.

173. *Id.* at 1277.

174. 65 F.3d 256 (2d Cir. 1995).

175. *Id.* at 262.

176. *Id.* at 263–64.

177. *Id.* at 263.

178. *Id.*

179. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013) (recognizing inconsistency in case law and distinguishing between cases involving individual persons and corporate entities).

180. Dkt. 101 at ¶ 23.

181. *Id.* at ¶¶ 2, 23–24, 83, 90.

182. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996).

sive corporate consciousness. And because Plaintiffs cannot prove distinctness under the facts alleged in their Third Amended Complaint, Defendants are entitled to judgment as a matter of law.[183]

Plaintiffs' claim may be cognizable under a different set of facts and theory of recovery. Under *Cedric Kushner*, for example, a plaintiff might sue a corporate officer for participating in an association-in-fact enterprise consisting of his employer and other corporate entities.[184] But that is not the case presented.[185] Instead, Plaintiffs chose to pursue Defendants and alleged that they collectively constituted a single entity that was coextensive with the enterprise. Here, coextensive liability, a single corporate consciousness, and shared membership in a single corporate family eviscerate the distinction between person and enterprise that might otherwise exist for separate legal entities.[186] As a result, Defendants are entitled to judgment as a matter of law on Plaintiffs' First Claim for Relief.[187]

## D. Analysis of Plaintiffs' UPUAA Claim

The parties dispute whether Plaintiffs' RICO and UPUAA claims rise and fall together.[188] While state courts are not required to adopt identical interpretations of UPUAA and RICO, the Utah Supreme Court often considers federal case law on RICO claims when analyzing comparable UPUAA provisions.[189]

 Here, the UPUAA contains a requirement of a distinct person and enterprise, employing language that is nearly identical to the RICO statute.[190] Plaintiffs provide neither authority nor persuasive argument for the proposition that UPUAA does not require a distinct person or enterprise. As the court has already concluded, the Third Amended Complaint does not allege a distinct person and enterprise. In the absence of a distinct person and enterprise, Plaintiffs cannot prevail under UPUAA.[191] Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiffs' Second Claim for Relief.

---

**183.** Plaintiffs cite *Cedric Kushner* for the proposition that they need only demonstrate formal or practical separateness. Dkt. 211, at 15–16. Far from formally adopting the Seventh Circuit's test for sole proprietorships, the *Cedric Kushner* decision resolved a narrow question: whether a single individual could be associated with an enterprise composed of a single corporate entity under § 1962(c). *See also* Dkt. 240, at 9–11 (discussing *Cedric Kushner*); *In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492 ("In 2001, the Supreme Court seemed to revive the separate-legal-identity theory, if only in the narrow context of a corporation wholly owned by a single individual.").

**184.** *Cedric Kushner*, 533 U.S. at 164, 121 S.Ct. 2087.

**185.** In their opposition, Plaintiffs asked the court for leave to amend. Dkt. 211, at 25 n.31. Under the Rules of Practice for the District of Utah, this request must be set out in a separate motion. Accordingly, the court does not reach the issue of whether an amendment is warranted under the facts of this case.

**186.** *See Bd. of Cnty. Comm'rs v. Liberty Grp.*, 965 F.2d 879, 885 (10th Cir. 1992) ("The language of the statute clearly contemplates that the 'person' charged will be distinct from the 'enterprise', since a person cannot logically be 'employed by or associated with himself.'"); *cf. Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001).

**187.** In a letter dated August 19, 2016 (Dkt. 299), Plaintiffs advised the court of a recent decision in the Tenth Circuit that Plaintiffs contend is controlling precedent. In *George v. Urban Settlement Services*, 833 F.3d 1242 (10th Cir. 2016), the Tenth Circuit considered, among other things, RICO's distinct enterprise requirement in the context of a lawsuit against Bank of America and Urban Settlement Services. Plaintiffs argue that *George* should lead the court to a different result than the one detailed above. England responded to Plaintiffs' arguments in a letter to the court dated August 24, 2016 (Dkt. 301). For the reasons set forth in England's letter, the court agrees that *George* is factually distinguishable and inapplicable in view of Plaintiffs' RICO theory.

**188.** *See* Utah Code Ann. § 76–10–1601 *et seq.*

**189.** *Hill v. Estate of Allred*, 216 P.3d 929, 938–39 (Utah 2009); *State v. Bradshaw*, 99 P.3d 359, 367 (Utah Ct. App. 2004), *rev'd on other grounds*, 152 P.3d 288 (Utah 2006); *cf. Bradford v. Moench*, 670 F.Supp. 920, 928 (D. Utah 1987).

**190.** *Compare* 18 U.S.C.A. § 1962(c), *with* Utah Code Ann. § 76–10–1603(3).

**191.** This is true even if the breadth of the term "enterprise" varies under UPUAA.

## II. Motion for Summary Judgment (Dkt. 230)

Defendants also move for partial summary judgment on Plaintiffs' Sixth Claim for Relief, claiming violation of the Utah Business Opportunity Disclosure Act (UBODA). The motion raises four issues: (1) whether Utah's choice of law rules extend UBODA to Plaintiffs; (2) whether Defendants offered an assisted marketing plan under UBODA; (3) whether the Federal Aviation Administration Act preempts UBODA, as applied to this case; and (4) whether the claim is time-barred.[192]

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [193] "A material fact is one that might affect the outcome of the suit under the governing law, and a genuine issue is one for which the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [194] When evaluating a motion for summary judgment, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." [195]

### B. Choice of Law

The first issue presented is whether Utah courts would apply California law, as opposed to Utah law, to the business opportunity claims in this case. The parties appear to agree that there is a conflict between the

---

192. After the court took the motion under advisement, England's counsel submitted a letter dated August 15, 2016, notifying the court of a legal development it believed was relevant to the viability of Plaintiffs' UBODA claim (Dkt. 298). Plaintiffs submitted a letter in response dated August 23, 2016 (Dkt. 300). This was followed by a further response from England in a letter dated August 26, 2016 (Dkt. 302), and finally a September 15, 2016 letter from Plaintiffs' counsel (Dkt. 303). In summary, the letters indicate that England contacted representatives of the Utah Division of Consumer Protection in about December 2015 concerning a provision in the UBODA statute at issue in this case. Thereafter, the Division promulgated through rulemaking Rule 152–15–3, titled "Compensated Employees and Independent Contractors." The Rule excludes certain conduct from the definitions of "sales program" and "marketing program" as those terms are used in the Utah UBODA statute. The Rule became effective on July 8, 2016. Under the Utah Administrative Rulemaking Act, the Rule is enforceable and now has the effect of law. England argues the new Rule makes clear that the conduct at issue here falls outside the intended scope of the UBODA. England further argues that because the new Rule merely clarifies, rather than substantively changes, existing law, the court should apply the Rule retroactively to bar Plaintiffs' UBODA claims in this case. While it appears the Utah Supreme Court has not directly ruled on the issue of retroactivity of administrative rules, the Court has noted that "[t]he retroactive application of a new regulation is not obvious. Instead, a controversy is typically 'determined on the basis of the [statutory or administrative] law as it existed at the time of the occurrence.'" *Utah Chapter of Sierra Club v. Air Quality Bd.*, 226 P.3d 719 (Utah 2009) (citations omitted). In dicta, the Court explained that "[r]etroactive application of an administrative

rule is an exception to this approach that requires thorough analysis." *Id.* England has failed to demonstrate that any such exception applies here. While England cites in its letter a handful of federal circuit decisions, none are controlling. This is particularly problematic where the Utah Supreme Court has adopted in at least some contexts an approach to agency law different than that applied under federal law. *See Ellis–Hall Consultants v. Public Serv. Comm.*, 379 P.3d 1270 (Utah 2016). Even then, England fails to suggest or cite any standard it believes should guide this court's "thorough analysis" to determine whether retroactive application of the Division's Rule is appropriate. Nor is there an adequate record before the court to enable any meaningful review of many of the factors considered in the federal cases cited by England. Additionally, were this court to retroactively apply the Division's Rule as England urges, other concerns the Utah Supreme Court has raised in related contexts may be implicated. *See Ellis–Hall Consultants*, 379 P.3d 1270 (discussing agency deference on legal issues and fairness to parties relying on plain language of existing laws); *Foil v. Ballinger*, 601 P.2d 144 (Utah 1979) (recognizing "grave constitutional problems" could arise if a law-making body attempted to determine the outcome of a particular case by passage of a law intended to accomplish that result). For these reasons, the court declines to consider the Division's 2016 Rule 152–15–3.

193. Fed. R. Civ. P. 56(a).

194. *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citation omitted) (internal quotation marks omitted).

195. *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

laws of these two jurisdictions.[196] Defendants contend that this court must apply California law. Plaintiffs urge application of Utah law.

▮▮▮▮ Federal courts sitting in diversity apply the choice of law rules of the forum state.[197] The Utah Supreme Court has adopted the "most significant relationship approach," as articulated in the Restatement (Second) Conflict of Laws.[198] This court must identify the relevant factors in the Restatement and then evaluate whether California or Utah bears "the most significant relationship to the occurrence and the parties."[199]

The parties dispute two issues relevant to the choice of law analysis. First, they dispute whether the contracts between Defendants and the drivers require application of Utah's business opportunity statute, UBODA. Second, in the event the contractual language does not govern the choice of law analysis, the parties dispute whether Utah or California bears the most significant relationship to the events at issue and the parties.

### 1. Effect of Choice of Law Provision in the Agreements

Utah appears to have adopted Section 187 of the Restatement (Second) Conflict of Laws, which applies when parties select and agree upon the application of a forum's law.[200] Citing this provision, Plaintiffs urge the court to broadly construe provisions in the Lease Agreement and Operating Agreement, and to apply Utah law to their UBODA claim.

▮▮▮▮ The court concludes that neither Defendants nor the drivers contracted to apply Utah law to the UBODA claim. In both the Operating Agreement and the Lease Agreement, the parties stipulated: "This Agreement shall be interpreted under the laws of the United States and the State of Utah, without regard to the choice-of-law rules of such State or any other jurisdiction."[201] Unlike provisions in many of the cases cited by Plaintiffs, the choice of law provisions in these contracts do not contain broadening language such as "arising out of" or "relating to" the subject matter of the agreements.[202] In this respect, the plain language of the agreements suggests that the choice of law provisions apply only to issues of contractual interpretation. Indeed, the narrow language of these provisions can be contrasted with language elsewhere in the agreements imposing a time limitation, but extending to claims relating to or arising out of the agreements.[203] The difference between the language of the two provisions suggests the parties did not contract to apply Utah law to any claims relating to or arising under either agreement.

Because the Agreements do not reflect the parties' intent to apply Utah law to legal issues beyond contract interpretation, the court concludes the agreements are not determinative, and Sections 145 and 148 of the Restatement are more applicable to assessing whether California or Utah has the most significant relationship to the claim.

### 2. Application of Restatement Section 145/148 Factors

▮▮▮▮ For torts, Utah courts traditionally apply the factors contained in Section 145 of the Restatement. These factors include "(a) the place where the injury oc-

---

**196.** *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P.3d 1156, 1165 n.10 (Utah Ct. App. 2012) ("Typically, a choice of law analysis is preceded by a determination of whether there is a true conflict between the laws of those states that are interested in the dispute.").

**197.** *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**198.** *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002) (internal quotation marks omitted).

**199.** *Id.* (quoting Restatement (Second) Conflict of Laws § 145(1)).

**200.** *See Jacobsen Const. Co. v. Teton Builders*, 106 P.3d 719, 723 n.2 (Utah 2005).

**201.** *See* Dkts. 101–8 (Leasing Agreement) at ¶ 21 and 101–5 (Operating Agreement) at ¶ 18.

**202.** *See, e.g., Brigham Young Univ. v. Pfizer, Inc.*, 2:06–CV–890 TS, 2012 WL 918744 (D. Utah Mar. 16, 2012).

**203.** *See, e.g.,* Dkt. 200–2, at DEF00000704, DEF00000660.

curred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." [204] Under the Restatement, courts evaluate these factors "according to their relative importance" based on the nature of the particularized issues.[205]

▆▆▆▆ Restatement Section 148 specifically addresses claims arising out of a fraud or misrepresentation.[206] When applying Section 148 to misrepresentations that involve individuals in several states, courts evaluate the following factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Plaintiffs do not address whether Section 145 or Section 148 has more bearing on this court's analysis of a statutory claim on the theories here advanced, in part because Defendants raised the issue in their reply brief. But the Section 148 factors are helpful insofar as the UBODA claims seeks to recover for harm that arose out of a claimed failure to disclose or report accurate information. After careful consideration of the undisputed facts, the arguments, and the Restatement, the court concludes Utah has the most significant relationship to the parties and the occurrence forming the basis of Plaintiffs' UBODA claim.

California undoubtedly has some relationship to this case under Section 145 and the first three Section 148 factors. Plaintiffs resided in California. While in California, Plaintiffs accessed online advertisements and spoke with England's recruiters. After enrolling in driver training school, Plaintiffs traveled to a California school, where they learned about Defendants' independent contractor program from instructors. Arguably, the injury occurred in California, where Roberts and McKay began to operate their trucking operations. But while these contacts suggest that California has a significant relationship to the claim, this does not end the inquiry. Under the Restatement, multiple states often share an interest to litigation. Here, the question is whether, notwithstanding these contacts, Utah has a more significant relationship.

Under both Section 145 and three factors of Section 148(b), Utah bears a significant relationship to the parties and the occurrence. The conduct ultimately causing the claimed injury occurred in the Utah, where Defendants purportedly created a business opportunity without adequate disclosures. And while a plaintiff's place of residence is entitled to substantial weight if the harm is pecuniary in nature,[207] it is also significant to the inquiry that Defendants are incorporated and headquartered in Utah.

Moreover, the business opportunity itself was based in Utah. Plaintiffs traveled to Utah to attend the Phase II Upgrade. Relying on representations received in Utah and elsewhere, Plaintiffs ultimately signed the Leasing Agreement and Operating Agreement in Utah. While Plaintiffs traveled across the nation as independent contractors for England, Defendants managed their op-

---

**204.** Restatement (Second) Conflict of Laws § 145(2) (setting forth "a principle applicable to all torts and to all issues in tort").

**205.** *Waddoups,* 54 P.3d at 1060 (quoting Restatement (Second) Conflict of Laws § 145(2)).

**206.** Restatement (Second) Conflict of Laws § 148, cmt. a.

**207.** Restatement (Second) of Conflict of Laws, § 148, cmt. i. (1971).

erations and the lease from their Utah headquarters. And in some respects, the injury occurred in multiple states, including Utah, where Defendants continued to deduct payments for fixed and variable costs.[208] The court concludes that the relationship between Plaintiffs and Defendants was centered in Utah and that some performance under the agreements occurred in Utah. All of these facts weigh in favor of applying Utah law, despite Plaintiffs' residency and the place of initial communication.

■■■ When resolving conflicts, courts often also consider the general choice of law factors articulated in Section 6 of the Restatement:[209]

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

The court concludes these factors slightly favor application of Utah law.

Both Utah and California have an interest in regulating fraudulent business opportunity schemes insofar as California desires to protect residents, while Utah has an interest in regulating its companies. Neither side argues that the needs of the interstate system favor California or Utah. But there are equally compelling arguments as to the justified expectations of parties. On the one hand, the Leasing Agreement and Operating Agree-

ment contain choice of law provisions for interpreting the contracts, but are silent respecting the law to apply to claims or disputes arising out of or related to the contracts. On the other hand, Defendants could justifiably expect that a statute in their home state would apply to their conduct within that state. Plaintiffs persuasively argue that where, as here, a party allegedly perpetrated a uniform scheme across the country, certainty, predictability, uniformity, ease of determination, and application of law weigh in favor of applying the law of the forum where the potentially liable party is based. But this factor weighs only slightly in favor of Plaintiffs, because similar arguments could be made about a bright-line rule requiring application of the law of the victim's home state. In short, after balancing these factors, the court concludes the Section 6 factors weigh modestly in favor of applying Utah law.

Ultimately, the question of which state has a more significant relationship to the business opportunity claim is a close one. But on balance, the court concludes Utah has the most significant relationship to the parties and events at issue. The conduct that formed the basis of the claim occurred predominantly in Utah. The heart of the claim—the Driving Opportunity—was developed, advertised, managed, and directed from Utah by a Utah-based company. For this reason, Utah law applies and Defendants are not entitled to summary judgment on the UBODA claim under a choice of law theory.

## C. Existence of an Assisted Marketing Plan

■■■ UBODA applies to "sellers" of "assisted marketing plans."[210] The parties dispute whether Plaintiffs will be able to prove at trial that Defendants marketed an "assisted marketing plan" within the meaning of UBODA.

**208.** Restatement (Second) of Conflict of Laws § 145, cmt. e (1971) ("When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."); *see also Anapoell v. Am. Express Bus. Fin. Corp.,* No. 2:07–CV–

198–TC, 2007 WL 4270548, at *12 (D. Utah Nov. 30, 2007) (concluding place of conduct carried significant weight given the monetary injury and nature of the claims).

**209.** Restatement (Second) of Conflict of Laws, § 6 (1971).

**210.** *See* Utah Code Ann. §§ 13–15–4, –5 (2011).

An assisted marketing plan is defined as "the sale or lease of any products, equipment, supplies, or services that are sold to the purchaser upon payment of an initial required consideration of $300 or more for the purpose of enabling the purchaser to start a business, in which the seller represents" one of four listed things.[211] Three of these listed seller representations are irrelevant to this case.[212] But a party may prove the existence of an assisted marketing plan by demonstrating that the seller represented "that upon payment by the purchaser of a fee or sum of money, which exceeds $300 to the seller, the seller will provide a sales program or marketing program that will enable the purchaser to derive income from the assisted marketing plan that exceeds the price paid for the marketing plan."[213]

Defendants maintain they are entitled to summary judgment under UBODA because: (1) there was no initial required consideration, and (2) Plaintiffs cannot show the existence of a separate sales or marketing program. The court takes up these arguments in turn.[214]

### 1. Initial Required Consideration

■ Defendants first argue the Driving Opportunity does not constitute an assisted marketing plan under UBODA because there was no "initial required consideration," an essential element of the statutory definition. "Initial required consideration" means the "total amount a purchaser is obligated to pay under the terms of the assisted marketing plan, either prior to or at the time of delivery of the products, equipment, supplies, or services, or within six months of the commencement of operation of the assisted marketing plan by the purchaser."[215] Notably, the statute excludes "not-for-profit sale of sales demonstration equipment, materials, or supplies for a total price of less than $300."[216]

Defendants argue: (1) England's Operating Agreement did not require independent contractors to lease products, equipment, or services; (2) drivers who leased vehicles made payments to Horizon, not England; (3) drivers were not required to make payments to England but instead voluntarily opted to have the company process expenses; and (4) drivers could have become independent contractors without paying tuition.[217] In short, Defendants aver that neither Roberts nor McKay were required to pay England initial required consideration and, as a result, the company does not qualify as a seller under the statute.

The court disagrees. Notwithstanding the language of the Agreements, Plaintiffs have proffered evidence that England and Horizon together developed a plan to attract individuals with no experience in the trucking industry by offering an opportunity to own a trucking business through the Leasing Agreement and Operating Agreement. The record contains testimony of company employees relating to joint recruiting efforts, internal documents describing the Implementation Plan, recruiting guides and scripts, and even pay statements. A reasonable jury could find at trial that Plaintiffs met their burden of demonstrating that England and

---

**211.** *Id.* § 13–15–2(1)(a).

**212.** In their opposition, Plaintiffs cite to Utah Code Annotated § 13–15–2(1)(a)(iii), which extends UBODA's reach to situations where a seller makes a guaranty. Because the court finds that Defendants are not entitled to summary judgment on the grounds asserted in its opening brief, the court declines Plaintiffs' invitation to consider whether they may survive Defendants' motion by presenting evidence that creates a dispute over the existence of a guaranty under a separate provision.

**213.** *Id.* § 13–15–2(1)(a)(iv).

**214.** *See* Dkt. 230 at 9.

**215.** Utah Code Ann. § 13–15–2(4)(a) (2011) (internal quotation marks omitted) ("If payment is over a period of time, 'initial required consideration' means the sum of the down payment and the total monthly payments.").

**216.** *Id.* § 13–15–2(4)(b).

**217.** Defendants also briefly argue England does not qualify as a seller because it never imposed on drivers an upfront, out-of-pocket investment. This argument appears to fail under the plain language of the statute, which includes within the definition of "initial required consideration" incremental payments within six months of the operation. Utah Code Ann. § 13–15–2(4)(a); *see Grappendorf v. Pleasant Grove City*, 173 P.3d 166, 169 (Utah 2007).

Horizon jointly offered the Driving Opportunity, which in turn required a payment of at least $300 within the first six months of the program in the form of either fixed leasing payments or variable mileage charges. In this context, the issue of initial required consideration may raise a series of interrelated factual issues at trial, including: (1) whether England and Horizon constituted a joint venture, (2) which company received the benefit of payments processed through England; and (3) whether particular deductions were required under the Driving Opportunity, as defined by Plaintiffs.

Against these facts, the court cannot find that England is entitled to summary judgment as a matter of law under the theory it did not require drivers to pay initial consideration.[218]

### 2. Seller Representation

Defendants next argue Plaintiffs cannot prove England or Horizon made a representation that would bring the Driving Opportunity within UBODA's definition of "assisted marketing plan."[219]

To constitute an assisted marketing plan, the seller must make a representation that falls within the statute.[220] Here, the parties dispute whether England represented "that upon payment by the purchaser of a fee or sum of money, which exceeds $300, the seller will provide a sales program or marketing program that will enable the purchaser to derive income from the assisted marketing plan that exceeds the price paid for the marketing plan."[221] Because the terms "sales program" and "marketing program" are not defined in the statute, Utah courts would attempt to give the terms their "usual and accepted meaning" by relying on dictionary definitions.[222]

Marketing is often defined as the "act or process of promoting and selling, leasing, or licensing products or services," or alternatively, as the "part of a business concerned with meeting customers' needs."[223] The noun "sales" is used to refer to "operations and activities involved in promoting and selling goods or services," or, as an adjective, to connote "of, relating to, or used in selling."[224] Among other things, "program" has been defined as "a plan or system under which action may be taken toward a goal."[225]

Defendants argue: (1) UBODA requires Plaintiffs to demonstrate that they paid for a marketing program beyond the initial required consideration, which they cannot do; and (2) England did not provide a sales or marketing program.[226] Neither argument, however, provides a basis for granting sum-

---

**218.** In their papers, Defendants attempt to parse out payment obligations to England and Horizon. Although the court finds this argument unpersuasive, it makes two observations. First, the language of the act does not clearly dictate that the purchaser pay to a particular seller within a joint venture. On the face of the statute, the relevant inquiry is whether a payment of a sufficient amount is required "for the purpose of enabling the purchaser to start a business," which is precisely what a jury may find in this case. *See* Utah Code Ann. §§ 13–15–2(1)(a), –(4). Second, the language of the act suggests that it extends to the type of scheme alleged in this case, where two companies associate with one another to offer a business opportunity to individuals. *See id.* § 13–15–2(5) (defining "person" to include a corporation, partnership association, or any other legal entity).

**219.** Utah Code Ann. § 13–15–2(1)(a)(iii)–(iv) (2011).

**220.** Utah Code Ann. § 13–15–2(1)(a) (2011).

**221.** *Id.* § 13–15–2(1)(a)(iv).

**222.** *Hercules Inc. v. Utah State Tax Comm'n*, 21 P.3d 231, 233 (Utah Ct. App. 2000) (citation omitted) (internal quotation marks omitted); *see also State v. Canton*, 308 P.3d 517, 520 (Utah 2013); *cf. State v. Souza*, 846 P.2d 1313, 1316 (Utah Ct. App. 1993) (citing Black's Law Dictionary and Webster's Collegiate Dictionary).

**223.** Black's Law Dictionary (9th ed. 2009); *cf. In re PVC Marketing Systems*, 1990 WL 605376, at *1 (Conn. Dep't Banking July 31, 1990) (including within definition of similar statute "advice or training pertaining to the sale of any products, equipment, supplies or services which advice or training is provided to the purchaser-investor"); 815 ILCS 602/5–5.15 (2002) (including "[o]perational, managerial, or financial guidelines or assistance or continuing technical support").

**224.** Merriam–Webster's Collegiate Dictionary at 1097 (11th ed. 2003).

**225.** *Id.* at 992.

**226.** Dkt. 230 at 1.

mary judgment in favor of England on the record presented.

Contrary to Defendants' theory, Utah Code § 13–15–2(1)(a)(iv) does not require a party affirmatively to prove an additional payment was made. Applying the plain and ordinary meaning of the statutory language, the court concludes UBODA merely requires a party to show that a seller represented that, on the payment of a threshold amount, it would provide the benefits of a program or plan relating to selling, leasing, or licensing goods or services, and that this plan or program would permit the purchaser to derive income in excess of the price paid.[227]

While proof of this payment may be relevant to whether the seller made a representation in the first instance, the court's inquiry under the statute centers on the occurrence of a qualifying representation, as opposed to the existence of a particular payment. Here, Plaintiffs offered some evidence that England developed the Driving Opportunity to attract independent contractors, indicated that independent contractors would pay leasing and variable mileage costs in exchange for business from one particular client (England), and suggested that the Driving Opportunity was an affordable and potentially lucrative business opportunity.[228] Because a reasonable jury could find Defendants' representations relating to the profitability of the Driving Opportunity met the statutory requirements, genuine issues of material fact preclude summary judgment.

In response, Defendants insist that the use of different terms in different subsections of the statute—marketing plan and marketing program—suggests that UBODA requires both initial consideration and a future payment for the program itself. As discussed above, the definitions of plan and program overlap. But even assuming UBODA requires a separate initial payment and then a subsequent payment for the marketing pro-

gram itself, genuine issues of material fact preclude summary judgment. Here, a reasonable jury could find that Defendants' program—the opportunity to provide services directly to England under the Leasing Agreement and the Operating Agreement—was contingent on lease payments, variable mileage payments, or both. In other words, a jury could distinguish the initial required consideration from payments required to continue to participate in the Driving Opportunity. If so, genuine issues of material fact exist on the issue of whether drivers paid for a marketing program under UBODA.

Defendants' UBODA challenge raises significant issues. At trial, England may convince the jury that England and Horizon did not work together to offer a business opportunity, that Plaintiffs did not make sufficient payments to either England or Horizon, or that the Driving Opportunity—at least as defined by Plaintiffs—does not constitute an assisted marketing plan under UBODA. On the record presented, however, Plaintiffs are entitled to all reasonable inferences that can be drawn from settlement reports, company documents describing the development of the independent contractor program, the affiliation between the two family-owned companies, testimony relating to recruitment, website advertising, and the England Business Guide. Taken together, this evidence raises a genuine issue of material fact concerning whether Defendants offered an assisted marketing plan to drivers without making statutory disclosures.

For all these reasons, the court concludes England is not entitled to summary judgment under UBODA at this stage of the proceedings.

## D. Preemption

The next issue is whether the Federal Aviation Administration Authorization Act preempts UBODA claims against motor car-

---

**227.** Utah Code § 13–15–2(1)(a). For this reason, the court also rejects England's narrow interpretation of the term "marketing," which appears to exclude more activity than just advertising or marketing. Neither the plain language of the statute nor the legislative history provided appears to foreclose the possibility that a seller might offer a plan under which the seller would assist an individual in offering transportation services to a single client.

**228.** *See, e.g.,* Dkt. 257 at 28–29, 48–52 (discussing recruiting documents, meetings with trainees, deposition testimony, the England Business Guide, and C.R. England's website).

riers like England. Defendants contend the Aviation Act's express preemption provision bars such claims. Plaintiffs argue the generally applicable statute in this case falls outside the Aviation Act's preemption provision.

Under the Aviation Act, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property." [229] When applying this preemption provision, courts often draw on the reasoning of two Supreme Court decisions: *Rowe v. New Hampshire Motor Transp. Ass'n* [230] and *Dan's City Used Cars, Inc. v. Pelkey*. [231]

In *Rowe*, the Supreme Court considered whether the Aviation Act preempted a state statute regulating tobacco delivery and imposing civil penalties for transporting tobacco products when either the sender or receiver lacked a state license. Importing a preexisting interpretation of a preemption provision from the Airline Deregulation Act of 1978, the Court held: (1) "[s]tate enforcement actions having a connection with, or reference to, carrier rates, routes, or services are preempted"; (2) "pre-emption may occur even if a state law's effect on rates, routes, or services is only indirect"; (3) "it makes no difference whether a state law is consistent or inconsistent with federal regulation"; and (4) "pre-emption occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives[,]" which was to ensure motor carriers received the benefit of "competitive market forces" which in turn would stimulate "efficiency, innovation, and low prices." [232]

Applying that standard, the Court held the Aviation Act preempted state tobacco laws. [233] Recognizing that the state statute directly targeted trucking and delivery services, the Court concluded the provision had a "significant and adverse impact" on the objectives of the Aviation Act, insofar as the licensing statute required "carriers to offer a system of services that the market does not provide" and would "freeze into place services that carriers might prefer to discontinue in the future." [234] The Court also discussed a provision in the statute that would impose an obligation to examine every package, concluding it "directly regulates a significant aspect of the motor carrier's package pickup and delivery service" in a manner prohibited by the Aviation Act. [235] Finally, the Court observed that imposing the tobacco regulations could "easily lead to a patchwork of state service-determining laws, rules, and regulations." [236]

The Court reached the opposite conclusion in *Dan's City Used Cars, Inc. v. Pelkey*. [237] There, the Court considered whether the Aviation Act preempted a state law that could be used to impose penalties on a towing company if it unlawfully possessed and disposed of a vehicle. [238] Reiterating the standard used in *Rowe*, the Court noted that the statutory phrase "related to" extended to any state law "having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly." [239] But "the breadth of the words 'related to' does not mean the sky is the limit." [240] To the contrary, the Aviation Act "does not preempt state laws affecting carrier prices, routes,

**229.** 49 U.S.C.A. § 14501(c)(1).

**230.** 552 U.S. 364, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008).

**231.** —— U.S. ——, 133 S.Ct. 1769, 185 L.Ed.2d 909 (2013).

**232.** *Rowe*, 552 U.S. at 370–71, 128 S.Ct. 989 (citation omitted) (internal quotation marks omitted).

**233.** *Id.* at 371 (citation omitted) (internal quotation marks omitted).

**234.** *Id.* at 372–73.

**235.** *Id.*

**236.** *Id.* at 373.

**237.** —— U.S. ——, 133 S.Ct. 1769, 185 L.Ed.2d 909 (2013).

**238.** *Id.* at 1775–76.

**239.** *Id.* at 1778.

**240.** *Id.*

and services in only a tenuous, remote, or peripheral manner." [241]

The Court then held that the Aviation Act did not preempt enforcement of a claim based on a state statute that was "related to neither the 'transportation of property' nor the 'service' of a motor carrier." [242] Under the definition of transportation,[243] the state statute did "not limit when, where, or how tow trucks may be operated" but instead created a basis for pursuing a company for neglecting "statutory and common-law duties of care." [244] The Court rejected the towing company's argument that the statute affected the service of a motor vehicle carrier, because the transportation service—removal of an abandoned vehicle—"ended months before the conduct on which [the vehicle owner's] claims are based." [245] Distinguishing *Rowe*, the Court observed that the statute "has neither a direct nor an indirect connection to any transportation services a motor carrier offers its customers." [246] The Court concluded the state statute meant to regulate disposal of towed vehicles was "far removed" from the purpose of the Aviation Act, which was to ensure that a patchwork of regulation did not obstruct the "free flow of trade, traffic, and transportation of interstate commerce." [247]

As the parties recognize in their papers, application of these principles and the Aviation Act varies depending on the context. At least one court has held that the Aviation Act preempted state laws governing independent contractors as applied to motor carriers because the laws directly and substantially impacted the business model of a trucking company.[248] Still other courts have held that generally applicable economic regulations—such as independent contractor wage laws or meal break requirements—have such a tenuous relationship to competitiveness as to fall outside the scope of the Aviation Act.[249]

As discussed above, Defendants argue UBODA is preempted because its enforcement against a motor carrier company like England directly affects trucking services, prices, and the transportation of property. Plaintiffs, however, contend the Aviation Act does not preempt their claims against Horizon or England because UBODA is a generally applicable state law that neither regulates transportation of property nor directly relates to prices, routes, or services. The court agrees with Plaintiffs and finds for the two reasons discussed below that the Aviation Act does not preempt the UBODA claim.

### 1. "Related to" Requirement

■■■ The court concludes that UBODA is not sufficiently related to the price, route, or service of a motor vehicle carrier. Instead, it is a generally applicable business regulation statute requiring entities engaging in the practice of offering business opportunities in the form of assisted marketing plans to comply with certain reporting and disclosure obligations.[250] Unlike the tobacco delivery regulations in *Rowe*, UBODA imposes obligation that are "tenuous, remote or peripheral" to a motor carrier's price, routes, or services. It regulates only the manner in which a motor

---

241. *Id.* (citations omitted).

242. *Id.* at 1778–79 ("[I]t is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.' ").

243. *See* 49 U.S.C.A. § 13102(23).

244. *Dan's City*, 133 S.Ct. at 1779 (rejecting argument that transportation included storage and handling of a vehicle, because the vehicle was no longer in movement or transit).

245. *Id.* at 1779.

246. *Id.* at 1780.

247. *Id.*

248. *See, e.g., Sanchez v. Lasership, Inc.*, 937 F.Supp.2d 730, 752 (E.D. Va. 2013).

249. *See, e.g., Schwann v. FedEx Ground Package Sys., Inc.*, No. 11–11094, 2013 WL 3353776 (D. Mass. July 3, 2013) ("Almost by definition, state employment laws (which almost always place constraints on an employer's freedom of contract) will impact the operating costs of a business subject to its regulation. But the indirect economic impact of a state law of general applicability is precisely the attenuated cause-and-effect that . . . would not trigger preemption."); *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 648 (9th Cir. 2014).

250. Utah Code Ann. §§ 13–15–4, –5 (2011).

carrier may offer business opportunities to third parties.

■ In this respect, UBODA is properly analogized to generally applicable discrimination, rest break, or wage laws which unavoidably affect drivers and motor carriers but have survived preemption challenges because they bear only a tenuous connection to motor carriers and do not exert a "significant impact on ... rates, routes, or services." [251] As the Ninth Circuit recently observed, "Congress did not intend to preempt generally applicable state transportation, safety, welfare, or business rules that do not otherwise regulate prices, routes, or services." [252]

And unlike cases where courts reach the opposite result, Defendants have not provided an evidentiary record here that supports the conclusion that compliance would have a "significant" effect on their prices, routes, or services.[253] This case stands in contrast to *Sanchez*, a case Defendants cite, where the district court evaluated a substantial record before finding the Aviation Act preempted a state law requiring a carrier to "convert its independent contractors to employees," resulting in "a categorical ban on the use of independent contractors by motor carriers in Massachusetts," and substantially limiting services, efficiency, and routes.[254]

In contrast, Defendants simply assert that patchwork compliance will affect its business

model, which is a substantial step removed from prices, routes, and services. As the Supreme Court recently observed, "the breadth of the words 'related to' does not mean the sky is the limit." [255] While UBODA compliance may place an indirect burden on England, nothing in the record suggests a significant likelihood that shipping prices would increase, routes would be cut, or services reduced.[256] And while approximately twenty-five states have adopted similar statutes, England has not shown that its decision to recruit or not recruit independent contractors in a particular state bears a sufficient connection to or impact on its prices, routes, or services.[257]

For these reasons, the court concludes UBODA is not sufficiently "related to" England's prices, routes, and services, and that the Aviation Act does not preempt Plaintiffs' claim on this basis.

### 2. Transportation Services

■ Alternatively, Defendants' motion must be denied because the Utah statute in question does not bear a sufficient connection to the "transportation of property." [258] Enforcement of the UBODA disclosure provision is analogous to enforcement of the towing statute in *Dan's City*, where the court held the state statute regulated conduct after

---

251. *Dilts*, 769 F.3d at 645 (quoting *Rowe*, 552 U.S. at 375, 128 S.Ct. 989).

252. *Id.* at 644.

253. *Sanchez*, 937 F.Supp.2d at 752 (analyzing specific economic effect of state law requiring motor carrier to classify independent contractors as employees on routes, services, and prices based on substantial evidentiary record). Notably, the *Sanchez* decision preceded the Supreme Court's decision in *Dan's City*.

254. *Id.* at 741–42, 744–46.

255. *Dan's City*, 133 S.Ct. at 1778.

256. England contends that compliance would have a qualitative and quantitative effect on services, because independent contractors are more productive and cost-effective. Yet, unlike in *Sanchez*, England has not shown how compliance with UBODA imposes such a cost that use of independent contractors would be impractical.

In this respect, England has failed to show that compliance has a significant, as opposed to tenuous, relationship to its transportation services. *See Dan's City*, 133 S.Ct. at 1779 (distinguishing between transportation service itself and conduct that occurred before or after provision of services); *see also Dilts*, 769 F.3d at 647 (evaluating specific effect on rates, routes, or services); *Schwann v. FedEx Ground Package Sys., Inc.*, No. 11–11094, 2013 WL 3353776, at *4 (D. Mass. July 3, 2013) (observing generally applicable laws necessarily have some effect on motor carriers).

257. *See also Martins v. 3PD, Inc.*, No. 11–11313, 2013 WL 1320454, at *12 (D. Mass. Mar. 28, 2013).

258. *Dan's City*, 133 S.Ct. at 1778–79 ("[F]or purposes of FAAAA preemption, it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.' ").

transportation had ended.[259] Here, UBODA is limited to regulating conduct that occurs before any property is transported. As applied, the statutory disclosure obligation and any related claims arose before Plaintiffs became independent contractors. UBODA's enforcement is thus distinguishable from statutes requiring motor carriers to treat active independent contractors as employees for wage purposes or mandate a specific number of rest breaks during transit.[260] Because UBODA provides redress for business activities entirely independent of the "transportation of property," the Aviation Act does not preempt its enforcement.

### E. Statute of Limitations

The final UBODA issue the parties present is whether a one-year statute of limitations that applies generally to penalties and forfeitures [261] extends to claims for damages under UBODA.[262] Defendants argue that an award of minimum statutory damages constitutes a penalty, subject to the one-year statutory period. Plaintiffs contend that the minimum damages provision is neither a penalty nor time-barred.

In Utah, "[a]n action may be brought within one year … upon a statute for a penalty or forfeiture where the action is given to an individual, or to an individual and the state, except when the statute imposing it prescribes a different limitation." [263] Under UBODA, a purchaser of a noncompliant business opportunity is "entitled … to rescission of the contract, to an award of a reasonable attorney's fee and costs of court in an action to enforce the right of rescission, and to the amount of actual damages or $2,000, whichever is greater." [264] Neither party cites to a Utah case that resolves the issue of whether a minimum damages award set by statute automatically constitutes a penalty within the meaning of the statute of limitations.

Defendants rely on a decision in which the Tenth Circuit held that a late check return claim was subject to the one-year statute of limitation for penalties and forfeitures, because: (1) the late check return statute required the payment of "a sum of money … by way of punishment for doing some act which is prohibited, or omitted to do some act which is required to be done," [265] (2) a one-year limitations period was consistent with the policy of the late check return statute, and (3) "the recovery provided by the statute is unrelated to any loss by the drawer or the drawer's bank." [266] Recognizing the issue was unsettled under state law, the Tenth Circuit specifically observed in its conclusion that the late check return statute "does not provide for the recovery of damages and fits more within the Utah definition of a penalty." [267]

In contrast, Plaintiffs rely primarily on a decision from this district where the court held that the limitations period was not applicable to a statute awarding treble damages.[268] There, the district court concluded that Utah courts had not defined "an action upon a statute for a penalty" and the one-year limitation period for an action on a

---

259. *Id.* at 1779. The Court relied on the statutory definition of transportation: "services related to … movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." *Id.* (quoting 49 U.S.C.A. § 13102(23)(b)); *cf. Schwann*, 2013 WL 3353776, at *3.

260. *Cf. S.C. Johnson & Son, Inc. v. Transp. Corp. Am., Inc.*, 697 F.3d 544, 558–59 (7th Cir. 2012) (distinguishing different types of laws and discussing remoteness of effect).

261. Utah Code Ann. § 78B–2–302(2).

262. *Id.* § 13–15–6(2).

263. *Id.* § 78B–2–302(2).

264. *Id.* § 13–15–6(2).

265. *In re Castletons, Inc.*, 990 F.2d 551, 558 (10th Cir. 1993) (quoting *State v. Franklin*, 63 Utah 442, 226 P. 674, 676 (1924)).

266. *Id.* ("Indeed, the recovery provided is limited to the amount of the late check, and the only apparent purpose of the statute is to encourage the prompt settlement of checks in negotiation and exact a tribute for failure to act in compliance with that purpose.").

267. *Id.*

268. *Sinclair Oil Corp. v. Atl. Richfield Co.*, 720 F.Supp. 894, 905 (D. Utah 1989).

penalty "was not intended to apply to remedial actions which allowed enhanced damages to the injured individual." [269] The court favorably cited a 1951 decision, *Christensen v. Paramount Pictures*.[270] In *Christensen*, the court held that the "penalty or forfeiture" statute of limitations did not extend to treble damages under the Sherman Act, after concluding that reference to a penalty, which harkened back to the common law, referred to "punishment imposed upon an offender against the criminal laws." [271]

None of these cases resolve the issue or meaningfully aid this court's analysis. Here, the statute imposing liability serves both a compensatory and punitive purpose. For example, an award of the statutory minimum may compensate an individual for actual damages less than $2,000, but would also penalize the seller for the difference between the statutory minimum and the actual damages. In this respect, the *Castleton* decision is unhelpful because the Tenth Circuit expressly concluded that the statute in that case was not intended to compensate. At the same time, Plaintiffs' cases do not grapple with the Utah Supreme Court's 1924 definition of penalty, which appears to be broader than the definition applied in *Sinclair* and *Christensen*.

More recently, Utah courts have looked to legislative intent surrounding the underlying statute imposing liability when considering whether a statute imposes a penalty [272] or falls within an exception to the statute of limitations.[273] For example, in *State v. Apotex Corp.*, the Utah Supreme Court rejected the argument that a statute fell outside the one-year statute of limitations for a penalty on the basis that the statute itself defined civil penalties.[274] Notably, no Utah court has cited the 1924 definition of penalty since 1940, and neither side cites to any authority for the proposition that any Utah court has imported that definition into its statute of limitations analysis.[275]

For these reasons, the court concludes that legislative intent is the most helpful metric for analyzing whether UBODA's imposition of a statutory fine when actual damages fall below $2,000 constitutes a penalty. Here, the section in which the statutory minimum is included is entitled: "Failure to file disclosures—Relief where seller fails to comply with chapter—Relief where division granted judgment or injunction—Administrative fines." [276] The plain language of this section makes no mention of a civil penalty. In contrast, a separate section within the same statute provides that a "person who violates any cease and desist order issued under this chapter is subject to a civil penalty not to exceed $5,000 for each violation." [277] Notably, that section is entitled: "Civil penalty for violation of cease and desist order." [278] The omission of similar language in the section

269. *Id.*

270. 95 F.Supp. 446 (D. Utah 1950).

271. *Id.* at 449–50 (rejecting argument that it extended to "means by which a private right is made secure."). Notably, the Tenth Circuit distinguished *Christensen* in the *Castletons* decision. *In re Castletons, Inc.*, 990 F.2d 551, 557 (10th Cir. 1993).

272. *State v. Apotex Corp.*, 282 P.3d 66, 81 (Utah 2012).

273. *See, e.g., Lorenzo v. Workforce Appeals Bd.*, 58 P.3d 873, 875 (Utah Ct. App. 2002) (concluding statute did not fall within exception where the plain language of the statute made no mention of civil penalties).

274. *Apotex Corp.*, 282 P.3d at 81–82.

275. Defendants cite a number of cases in their reply, none of which resolve the issue before the court: *Diversified Holdings, L.C. v. Turner*, 63 P.3d 686, 699 (Utah 2002) (discussing punitive damages, rather than statute of limitations); *Andreason v. Felsted*, 137 P.3d 1, 5 (Utah Ct. App. 2006) (characterizing statutory damages under the Utah Consumer Sales Practices Act as a "civil penalty" without any discussion of the statute of limitations).

276. Utah Code Ann. § 13-15-6.

277. *Id.* § 13-15-7 ("Civil penalties authorized by this chapter may be imposed in any civil action brought by the attorney general or by a county attorney under this section. All penalties received shall be deposited in the Consumer Protection Education and Training Fund created in Section 13-2-8. No action to collect a civil penalty may be commenced more than five years after the date the penalty was imposed.").

278. *Id.*

discussing relief for an individual purchaser is instructive. If the Utah Legislature had intended for this court to treat the $2,000 as a civil penalty, it would have included language, as it did elsewhere in the statute, referring to or characterizing the statutory award as a penalty. It did not.[279]

The court finds *Castletons* and the 1924 definition of penalty are distinguishable. Here, the statutory minimum damages serve a hybrid purpose that includes compensating the purchasers of business opportunity plans. Extension of the one-year statute of limitations for penalties would be contrary to legislative intent and at odds with the remedial purpose of UBODA. Accordingly, the court concludes that Utah courts would not apply the one-year statute of limitations for penalties. Plaintiffs' UBODA claim is not time-barred.

## III. MOTION FOR CLASS CERTIFICATION (DKT. 206)

Plaintiffs move for certification of a nationwide class for claims arising under the Utah Business Opportunity Disclosure Act, the Utah Consumer Sales Practices Act, the Utah Truth in Advertising Act, and the common law doctrines of negligent misrepresentation, breach of fiduciary duty, and unjust enrichment. Plaintiffs also move for certification of two subclasses for their breach of contract and fraud claims.[280] For the reasons discussed below, the motion for class certification is granted in part and denied in part.

### A. Standard for Class Certification

Rule 23, Federal Rules of Civil Procedure, permits parties to pursue resolution of complex disputes through a class action as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." [281] Class certification is permitted only if certain conditions set forth in the Rule are met.

First, Rule 23(a), *Prerequisites,* "requires the party seeking certification to demonstrate that: (1) 'the class is so numerous that joinder of all members is impracticable' (numerosity); (2) 'there is a question of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties are typical of the claims or defenses of the class' (typicality); and (4) 'the representative parties will fairly and adequately protect the interests of the class' (adequacy)." [282] After satisfying all Rule 23(a) requirements, the party seeking certification must "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b) [*Types of Class Actions*]." [283] Here, Plaintiffs seek to satisfy Rule 23(b)(3), which "requires the court to find that: (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' (predominance); and (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' (superiority)." [284]

As the Tenth Circuit recently recognized, "Rule 23 is more than a pleading standard. Hence, the 'party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.' Further, the district court has an independent obligation to conduct a 'rigorous analysis' before concluding that Rule 23's requirements have been satisfied. Often that analysis requires looking at the merits of a plaintiff's claim." [285]

---

279. *See Carrier v. Salt Lake Cnty.,* 104 P.3d 1208, 1216 (Utah 2004) (adopting canon of statutory construction that "the expression of one should be interpreted as the exclusion of another" and giving "effect to any omission").

280. Plaintiffs also sought certification of the now-dismissed RICO and UPUAA claims.

281. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,* 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011)).

282. *Id.* (quoting Fed. R. Civ. P. 23(a)).

283. *Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013).

284. *Wallace B. Roderick Revocable Living Trust,* 725 F.3d at 1217 (quoting Fed. R. Civ. P. 23(b)(3)).

285. *XTO Energy, Inc.,* 725 F.3d at 1217 (internal quotation marks and citations omitted); *see Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013); *Dukes,* 131

 And the Supreme Court has instructed lower courts to "probe behind the pleadings before coming to rest on the certification question" and that the Rule 23(a) analysis "will frequently overlap with the merits of the plaintiff's underlying claim." [286] This is equally true for the Rule 23(b) analysis.[287]

 But this inquiry is not without limit. The Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." [288] Merit questions should be considered only insofar as "they are relevant to determining whether the Rule 23 prerequisites ... are satisfied." [289]

Consistent with the language of Rule 23, this court first considers whether Plaintiffs carry their burden of satisfying the four Rule 23(a) prerequisites and then evaluates whether class certification is appropriate under the relevant Rule 23(b) factors.

## B. Rule 23(a)

 Under Rule 23(a), class certification is appropriate only if four requirements are satisfied: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." [290] Stated differently, class certification under the Federal Rules of Civil Procedure demands "numerosity, commonality, typicality, and adequate representation." [291] Together, the elements of Rule 23(a) "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." [292]

The court below considers in turn whether the Plaintiffs have met their strict burden of proof to show that all of the Rule 23(a) requirements are met.[293]

### 1. Numerosity

The court first considers whether the proposed class is "so numerous that joinder of all class members is impracticable" as required under Rule 23(a)(1). Recognizing that no precise number satisfies this requirement, courts have observed that a class in excess of one hundred is usually sufficient.[294]

 In this case, Plaintiffs contend the proposed class exceeds 14,708 drivers. Defendants do not seriously dispute that numerosity exists on the record presented. Given the size of the putative class and subclasses, potentially including thousands of drivers, the court finds that Plaintiffs have satisfied the numerosity requirement.

### 2. Commonality

The court next considers whether Plaintiffs have shown, as Rule 23(a)(2) requires, "questions of law or fact common to the class." The

S.Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

**286.** *Comcast*, 133 S.Ct. at 1432 (internal quotation marks and citations omitted).

**287.** *Id.* (noting that predominance inquiry may be even more demanding than Rule 23(a) analysis); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1228 (10th Cir. 2013) (characterizing burden as "strict" in discrimination case).

**288.** *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013).

**289.** *Id.* (citing *Dukes*, 131 S.Ct. at 2552 n.6).

**290.** Fed. R. Civ. P. 23(a); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

**291.** *Dukes*, 131 S.Ct. at 2550.

**292.** *Id.* (citations omitted) (internal quotation marks omitted).

**293.** *Rex v. Owens ex rel. State of Okl.*, 585 F.2d 432, 435 (10th Cir. 1978).

**294.** *See, e.g., Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *Dilley v. Acad. Credit, LLC*, No. 2:07–CV–301, 2008 WL 4527053 (D. Utah Sept. 29, 2008).

parties dispute whether this prerequisite, referred to as commonality, exists for the claims that Plaintiffs seek to certify. Given the complexity of the parties' dispute, the court will discuss the governing standard and helpful cases before analyzing each of the substantive claims at issue.

### a. *Standard*

The commonality prerequisite has generated considerable discussion over the last several years, in part because of the Supreme Court's holding in *Wal–Mart Stores, Inc. v. Dukes*.[295] Commonality was the "crux" of *Dukes*.[296] There, the Court considered whether class certification was warranted for a putative class of 1.5 million female employees who sought to recover under Title VII of the Civil Rights Act of 1964.[297] The plaintiffs argued that Wal–Mart subjected female employees to discriminatory pay and fewer promotion opportunities compared to male counterparts. The district court certified a class based on statistical evidence, anecdotal reports, and the expert testimony of a sociologist.[298] The Ninth Circuit affirmed in part after concluding that the evidence "raise[d] the common question whether Wal–Mart's female employees nationwide were subjected to a single set of corporate policies (not merely a number of independent discriminatory acts) that may have worked to unlawfully discriminate against them in violation of Title VII." [299]

▬▬ The Supreme Court reversed. The Court concluded that commonality requires more than mere recitation of common questions.[300] Because a plaintiff seeking certification must show that the putative class members "suffered the same injury," [301] the proposed class members' "claims must depend upon a common contention." [302] The common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." [303] The Court observed that this inquiry necessarily implicates "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of litigation." [304]

Applying that principle, the Court observed that resolution of the Title VII claims hinged on "the reason for a particular employment decision" and expressed concern that the plaintiffs sought recovery for "literally millions of [Wal–Mart's] employment decisions at once." [305] The Court reiterated that an individual could successfully pursue a class action by submitting "significant proof" of a "general policy of discrimination." [306] But where the only proof was a sociologist's "social framework" analysis relating to Wal–Mart's corporate culture in support of certification, the Court held that the class representatives failed to carry their burden of establishing commonality.

Notably, the Court concluded that the only corporate policy on the record facilitated "discretion by local supervisors over employment matters," which prevented "convincing proof of a companywide discriminatory pay

---

295. 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

296. *Id.* at 2550.

297. *Id.* at 2546.

298. *Id.* at 2549.

299. *Dukes v. Wal–Mart Stores, Inc.*, 603 F.3d 571, 612 (9th Cir. 2010) (en banc), *rev'd*, 564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011).

300. *Dukes*, 131 S.Ct. at 2551.

301. *Id.* at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

302. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

303. *Id.; see also Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) (recognizing that merely raising a potential issue is not enough).

304. *Dukes*, 131 S.Ct. at 2551 (citation omitted) (emphasis in original).

305. *Id.* at 2552 ("In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal–Mart engages in a *pattern or practice* of discrimination.").

306. *Id.* at 2553.

and promotion policy." [307] The Court further rejected the plaintiffs' reliance on statistical or anecdotal evidence, because: (1) the statistical evidence failed to show the existence of a "specific employment practice" that applied to millions of employees, and (2) the anecdotal evidence was not sufficient to establish that Wal–Mart "operates under a general policy of discrimination." [308] However, the Court left open the possibility that a "uniform employment practice ... would provide the commonality needed for a class action." [309]

### b. Analysis

Defendants contend that a classwide proceeding would not generate common answers capable of resolving this litigation because: (1) members of the putative class received and relied on a variety of different representations; (2) independent contractors had a range of reasons for joining the independent contractor program; and (3) the fact that hundreds of trainees became company drivers, as they originally intended, precludes a finding of commonality for the proposed subclass on Plaintiffs' breach of contract claim. [310]

None of these arguments persuade the court that Plaintiffs are unable to make showing of common issues of law and fact. Both before and after *Dukes*, courts have held that differences between class members do not preclude a finding of commonality, so long as the claims present common questions of fact and law. This is because class actions necessarily sweep in members whose individual experiences are not precisely identical. To the extent individual experiences demonstrate the claims are inapt for class certification, the court concludes that these arguments go primarily to the predominance inquiry under Rule 23(b). For example, although Defendants maintain that individual experience precludes commonality on breach of contract, the argument in the papers primarily goes to whether breach is an individualized question that outweighs the common issue presented by uniform contracts—an inquiry that sounds more in Rule 23(b) than Rule 23(a). The court concludes that Defendants' individual evidence theory, at least for the purpose of the commonality analysis, is largely unpersuasive.

Defendants also argue that *Dukes* forecloses class certification in this case. [311] Yet, *Dukes*, standing alone, does not resolve the commonality question presented in this case. Unlike *Dukes*, this case involves evidence of a uniform, company-wide policy of persuading drivers to enroll in England's independent contractor program and to lease from Horizon. [312] Wal–Mart's policy of discretion and varied treatment of millions of employees barred class certification of employment discrimination claims. Here, there is evidence that recruiters and trainers acted with common purpose and direction when describing life as an independent contractor and when encouraging trainees to join the program. Indeed, the Court in *Dukes* was primarily concerned with the absence of common answers to common questions, the lack of an

---

**307.** *Id.* at 2554.

**308.** *Id.* (brackets omitted).

**309.** *Id.*; *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) (describing *Dukes* and discussing its varied treatment in cases involving class certification of employment discrimination claims).

**310.** Defendants briefly assert that Roberts never formally requested a company position, and that McKay did not testify that he wanted to be a company driver in his deposition. Dkt. 245 at 62. Defendants further contend that Plaintiffs' statutory claims require causation, but the court concludes this theory is more properly characterized as an argument against a finding of predominance.

**311.** Dkt. 245 at 58–62. The court finds unpersuasive the cases cited in Defendants' commonality analysis. Most of these cases are distinguishable on their facts. *See, e.g., Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069–70 (9th Cir. 2014) (concluding district court did not err where plaintiff did not allege or seek to prove all class members were exposed to deceptive practices); *Foster v. Apache Corp.*, 285 F.R.D. 632, 641 (W.D. Okla. 2012) (concluding variation in dozens of leases and royalties that depended on individual circumstances precluded a commonality finding).

**312.** For example, Plaintiffs proffered evidence that Defendants uniformly misrepresented projected mileage and income in the England Business Guides between November 2006 and November 2010.

evidentiary foundation, and the nature of the asserted claims. In contrast, Plaintiffs in this case have proffered evidence of a uniform policy and approach, articulated in the Implementation Plan, which provides an evidentiary basis for finding common answers to common questions.

Mindful of its obligation to engage in a rigorous analysis of the Rule 23(a) factors, the court will evaluate each asserted claim in turn under the standard articulated in *Dukes*. As stated below, the court finds that Plaintiffs satisfied their burden of showing commonality for each of their claims.

### i. Utah Business Opportunity Disclosure Act

■ As discussed above, UBODA requires sellers of assisted marketing plans to register with the State of Utah and to provide specific disclosures to prospective purchasers. Here, Plaintiffs demonstrated that the claim presents several common questions of law and fact: (1) whether the Driving Opportunity is a seller-assisted marketing plan; (2) whether Defendants registered with the Utah Division of Consumer Protection; and (3) whether Defendants provided disclosure statements to purchasers, as required by UBODA. Resolution of these issues will largely depend on Defendant's conduct. Plaintiffs proffered sufficient evidence for the court to conclude that the classification of the Driving Opportunity, its registration under UBODA, and the existence of adequate statutory disclosures are uniform to the class. Because resolution of these central issues would resolve the claim "in one stroke," the court finds that Plaintiffs met their commonality burden for this claim.

### ii. Utah Consumer Sales Practices Act

■ The Utah Consumer Sales Practices Act "prohibits deceptive or unconscionable acts or practices by a supplier in connection with a consumer transaction."[313] Under the Sales Act, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally" commits one of many statutorily enumerated acts, regardless of "whether it occurs before, during, or after the transaction."[314] A supplier is defined as a "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer."[315] Among other things, a consumer transaction includes "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property"[316] when its purposes "relate to a specific type of business opportunity ...."[317]

■ After careful consideration of the testimony and exhibits submitted, the court finds that Plaintiffs' Sales Act claim raises common questions of fact and law. Specifically, Plaintiffs and the class suffered the same type of injury arising out of a common course of conduct designed to sell students and trainees the Driving Opportunity. Resolution of a series of questions will resolve issues central to the validity of the class's claim: (1) whether the sale of the Driving Opportunity was a consumer opportunity; (2) whether use of inaccurate or incomplete recruiting materials, such as the ones presented here, constituted a deceptive act and practice; (3) whether Defendants knowingly offered an untenable number of independent

---

313. *Carlie v. Morgan*, 922 P.2d 1, 5–6 (Utah 1996).

314. Utah Code Ann. § 13–11–4(2)(a).

315. *Id.* § 13–11–3(6).

316. *Id.* § 13–11–3(2)(a) (defining requirements for business opportunity).

317. *Id.* § 13–11–3(2)(a)(ii). In full, § 13–11–3(2)(a) provides:

(2)(a) "Consumer transaction" means a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance) to, or apparently to, a person for:
(i) primarily personal, family, or household purposes; or
(ii) purposes that relate to a business opportunity that requires:
(A) expenditure of money or property by the person described in Subsection (2)(a); and
(B) the person described in Subsection (2)(a) to perform personal services on a continuing basis and in which the person described in Subsection (2)(a) has not been previously engaged.

contractor positions; (4) whether Defendants concealed the likelihood of success for an independent contractor; and (5) whether Defendants concealed accurate pay information and/or turnover rates.

Each of these issues raises questions of fact or law common to the class and apt to resolve the validity of the claim. And while there may be minor variations for class members, there is also sufficient evidence that these central and uniform issues are "capable of classwide resolution." [318] For these reasons, the court finds that Plaintiffs have satisfied the commonality requirement for the claim arising under the Utah Sales Consumer Practices Act.

### iii. Utah Truth in Advertising Act

The Utah Truth in Advertising Act was intended "to prevent deceptive, misleading, and false advertising practices and forms in Utah." [319] Relevant to this case, a violation of the Advertising Act occurs when a person: (1) misrepresents uses, benefits, or qualities of goods or services; (2) "advertises goods or services or the price of goods or services with intent not to sell them as advertised"; (3) advertises goods and services in excess of "a reasonable expectable public demand"; or (4) "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." [320]

■ In light of the substantial evidence of a uniform, centrally-driven approach to marketing and promoting the Driving Opportunity and independent contractor program, as well as the relative consistency in mileage and income representations during the class period, the court finds this claim raises issues of law and fact common to the class. Plaintiffs allege the class suffered the same injury under the Advertising Act and that the claim's resolution hinges on these common questions. Some variations in access to advertising material do not preclude a finding of commonality. Indeed, resolution of several issues will be common to the class: (1)

whether Defendants' common conduct rose to the level of a deceptive trade practice, (2) whether uniform misrepresentation in the wide range of advertising and written marketing materials falls within the Advertising Act, and (3) whether the Driving Opportunity constitutes goods and services. For these reasons, Plaintiffs carried their burden of demonstrating commonality for this claim.

### iv. Common Law Fraud

■ In Utah, a party seeking to recover on a fraud claim must prove:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.[321]

■ As discussed above, Plaintiffs presented evidence of consistent representations of mileage and income to students and trainees that may have been uniformly false during the class period. Specifically, Plaintiffs submitted evidence of three graphs in the England Business Guide, which Defendants provided to every student and instructed them to review. Similarly, Plaintiffs proffered evidence that Defendants uniformly misrepresented independent contractor mileage and income through several mediums, including online marketing, recruiting scripts, and the Business 101 program. The evidentiary record and Plaintiffs' allegations suggest that resolution of the fraud claim depends at a minimum on the answers to several common questions: (1) whether Defendants knowingly or recklessly made representations for the purpose of inducing individuals into purchas-

---

318. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

319. Utah Code Ann. § 13–11a–1.

320. *Id.* §§ 13–11a–3(1)(e), -(i), -(j), -(t).

321. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996).

ing the Driving Opportunity, (2) whether the representations were false, and (3) whether the representations were material. Accordingly, the court finds Plaintiffs satisfied their burden of demonstrating the existence of at least one "common contention ... capable of classwide resolution [and] central to the validity" of Plaintiffs' fraud claim.[322]

### v. Negligent Misrepresentation

■■■■ Utah courts recognize negligent misrepresentation as a "form of fraud" and interpret "the elements of the tort in a manner consistent with principles of common-law fraud."[323] To recover under a negligent misrepresentation theory, a party must prove a duty to disclose.[324] Utah courts have distinguished negligent misrepresentation from fraudulent misrepresentation.[325] The former requires proof that: "(1) a party carelessly or negligently makes a false representation, (2) the plaintiff actually relies on the statement, and (3) suffers a loss as a result of that reliance."[326]

■■■ As discussed above, the court concludes that the statements forming the basis of liability in this case are alleged to be consistently and uniformly inaccurate during the class period. And Plaintiffs have presented evidence that mileage and income representations failed to reflect reality. Similar to the fraud claim, the truth or falsity of the representations is capable of classwide resolution. Moreover, resolution of whether Defendants crafted and then repeated the representations in the England Business Guide and similar recruiting materials with the requisite state of mind is a common issue of fact and law under Rule 23(a). Plaintiffs have

presented sufficient evidence of commonality for the negligent misrepresentation claim.

### vi. Breach of Contract

■■■ To prevail on their contract claim, Plaintiffs must show "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[327]

■■■ Plaintiffs seek certification of a group of individuals who signed the Student Training Agreement during the class period. Unlike in the cases cited by Defendants, there is no indication that the terms of the Student Training Agreement varied from student to student. The common basic contract terms present at least one common question under Utah law. Because the obligation at the heart of the claim—whether England offered trainees positions as company drivers—appears to be identical in the Student Training Agreements, it is capable of classwide resolution.[328] For this reason, the court finds that Plaintiffs have made a threshold showing of commonality for the breach of contract claim.

### vii. Unjust Enrichment

■■■ Unjust enrichment claims require proof of three elements: (1) "there must be a benefit conferred on one person by another," (2) "the conferee must appreciate or have knowledge of the benefit," and (3) "there must be 'the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment for its value.' "[329]

---

**322.** *Dukes*, 131 S.Ct. at 2551.

**323.** *Smith v. Frandsen*, 94 P.3d 919, 923 (Utah 2004).

**324.** *Id.*

**325.** *Moore v. Smith*, 158 P.3d 562, 574 n.12 (Utah Ct. App. 2007) (discussing differences between fraudulent and negligent misrepresentation and concluding party could not prevail on both).

**326.** *Id.* (citation omitted) (internal quotation marks omitted).

**327.** *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

**328.** *See supra* note 311 (identifying and discussing cases); *cf. Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2556, 180 L.Ed.2d 374 (2011) (recognizing even a single common question satisfies the requirements of Rule 23(a)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013).

**329.** *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000) (quoting *Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984)).

■ Plaintiffs allege Defendants benefited from passing off costs and expenses to independent contractors. This theory of recovery hinges on whether Defendants: (1) understood that independent contractors could be a source of revenue, (2) retained the benefits of the independent contractor program, and (3) did so through an unjust and fraudulent scheme with full knowledge that most independent contractors would fail. These questions are capable of classwide resolution. Specifically, there is evidence of uniform advertising material, internal company studies, and internal correspondence, all of which consistently emphasized the importance or desirability of the independent contractor program. Because resolution of these issues can be determined on a classwide basis, which in turn drives the determination of liability, the court finds that Plaintiffs met their commonality burden for the unjust enrichment claim.[330]

### viii. Breach of Fiduciary Relationship

■ In Utah, an individual may assert a breach of fiduciary duty based on a failure to disclose information by showing: "(1) a fiduciary duty to disclose material information, (2) knowledge of the information, and (3) failure to disclose the information."[331] If the claim sounds in fraudulent nondisclosure, the party must demonstrate: (1) a legal duty to disclose, (2) knowledge of the material information, and (3) a failure to disclose."[332] Utah courts appear to recognize that a confidential relationship may give rise to a fiduciary duty in limited circumstances.[333] At least one other court has concluded that a franchisee relationship may give rise to a fiduciary duty.[334]

■ In this case, common issues of fact and law will drive the breach of fiduciary duty claim. Specifically, on the record presented, the following issues may be resolved on a classwide basis: (1) whether the relationship between independent contractors and Defendants—driven by the Driving Opportunity and a disparity in access to information—created a fiduciary relationship between the class members and Defendants; (2) if so, whether Defendants failed to disclose accurate and material mileage and income information; and (3) whether Defendants knew that the information consistently conveyed to potential independent contractors was false. For these reasons, the court finds that commonality was met for the breach of fiduciary duty claim.

### c. Conclusion

After *Dukes* clarified the analysis, the threshold for satisfying commonality remains within reach for plaintiffs, even when there is variation among class members.[335] Applying *Dukes*, and following a rigorous analysis of each of the asserted claims, the court finds Plaintiffs satisfied their burden of showing commonality because the class members "suffered the same injury" for each claim, and the facts giving rise to liability under each legal theory "present a common issue that could be resolved efficiently in a single proceeding."[336]

### 3. Typicality

■ Rule 23(a)'s third requirement is typicality. To establish typicality, a class representative must show "the claims or defenses of the representative parties are typical of

**330.** *See, e.g., In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 668 (D. Kan. 2013).

**331.** *Gilbert Dev. Corp. v. Wardley Corp.*, 246 P.3d 131, 139 (Utah Ct. App. 2010).

**332.** *Id.*

**333.** *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (observing "confidential relationship may similarly arise whenever a continuous trust is reposed by one party in the skill and integrity of another").

**334.** *Arnott v. Am. Oil Co.*, 609 F.2d 873, 881 (8th Cir. 1979).

**335.** William B. Rubenstein, Newberg on Class Actions § 3:18 (5th ed. 2012); *Dilley v. Acad. Credit, LLC*, No. 2:07–CV–301, 2008 WL 4527053, at *3 (D. Utah Sept. 29, 2008) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).

**336.** *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1228 (10th Cir. 2013) (citations omitted) (internal quotation marks omitted).

the claims or defenses of the class." [337] In the Tenth Circuit, "typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." [338] It is not necessary for every class member to be "in a situation identical to that of the named plaintiff." [339]

 Parties opposing class certification often point to variations in the experience of proposed class members. Courts, however, have clarified that typicality does not demand exactly identical interests and claims.[340] Rather, typicality depends on the "same course of events" and "similar legal arguments to prove the defendant's liability." [341] Additionally, where, as here, a party seeks to recover for fraud, "the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct." [342]

 Here, "the claims of the class representatives and class members are based on the same legal or remedial theory." [343] As

discussed in the commonality analysis above, Plaintiffs and class members invoke the same statutes and common law doctrines, rely on identical theories of recovery, and seek the same remedies.[344] Although Defendants point to some variation in the experiences of trainees or independent contractors, the core of this case remains the same for all members of the class. Plaintiffs claim that Defendants developed and used a consistent and inaccurate message to induce individuals into attending England's driving schools and then enrolling in the Driving Opportunity to the independent contractors' financial detriment.

In other words, the claims for each class member arise out of the same course of events. Each class member and the named Plaintiffs have the same incentive to prove the claims and defenses.[345] Even if Roberts or McKay received slightly different versions of the core messages or had different priorities during their recruitment, as Defendants contend, the court is not persuaded that these minor differences will limit their ability to pursue relief for the class's aligned interests.[346] Plaintiffs have satisfied their burden of demonstrating typicality.

---

**337.** Fed. R. Civ. P. 23(a)(3); *see also Miller v. Basic Research, LLC*, 285 F.R.D. 647, 656 (D. Utah 2010) (noting typicality has been "satisfied if the named plaintiffs' claims arise from the same events or practices giving rise to the claims of other class members and are based on the same law").

**338.** *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010).

**339.** *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014); *Devaughn*, 594 F.3d at 1195 (observing differences in a particular situation may not defeat commonality or typicality); *see also Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."). In *Devaughn*, for example, the Tenth Circuit rejected the argument that plaintiff must show every member in a proposed class of children was exposed to the safety issues in order to satisfy typicality or commonality. 594 F.3d at 1195.

**340.** *Devaughn*, 594 F.3d at 1195; *see, e.g., In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 221, 229 (D. Kan. 2010) ("If the claims of the representatives and class members are based on the same legal or remedial theory,

differing fact situations of class members do not defeat typicality."); *Gonzales v. City of Albuquerque*, No. CIV-09-0520, 2010 WL 4053947, at *9 (D.N.M. Aug. 21, 2010).

**341.** *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).

**342.** William B. Rubenstein, Newberg on Class Actions § 3:36 (5th ed. 2012).

**343.** *Colorado Cross*, 765 F.3d at 1216.

**344.** *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (observing "commonality, typicality, and adequacy requirements . . . 'tend to merge' ").

**345.** *Commander Properties Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 535 (D. Kan. 1995) ("A representative's claims may differ factually and still be typical if they arise from the same events or course of conduct and share the same remedial theories.") (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1299 (10th Cir. 1999).

**346.** *See Makaeff v. Trump Univ., LLC*, No. 3:10–CV–0940, 2014 WL 688164, at *9 (S.D. Cal. Feb. 21, 2014) (noting claims need only be "reasonably co-extensive" not "substantially identical").

#### 4. Adequacy

 The final Rule 23(a) requirement—adequacy—requires the class representative to show "the representative parties will fairly and adequately protect the interest of the class." [347] In the Tenth Circuit, courts often evaluate adequacy by asking two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" [348] The adequacy inquiry often overlaps with typicality and commonality.[349]

 Defendants do not specifically challenge the adequacy of the class representatives. Based on the class representatives' declarations and the information submitted relating to counsel, the court finds that Roberts and McKay will fairly represent the class. There exists no apparent conflict of interest between the class representatives and the putative class. And where, as here, Plaintiffs retained qualified and experienced attorneys who have competently pursued class certification and opposed dispositive motions, the court finds the representative parties will "prosecute the action vigorously on behalf of the class." [350] For these reasons, the court finds that Plaintiffs met their burden under the adequacy prong of the analysis.

347. Fed. R. Civ. P. 23(a)(4).

348. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also* William B. Rubenstein, Newberg on Class Actions § 3:54 (5th ed. 2012).

349. *Colorado Cross*, 765 F.3d at 1216; *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013).

350. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002) (citation omitted).

351. *See Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013).

352. Dkt. 206 at 58.

353. Fed. R. Civ. P. 23(b). The Advisory Committee's note is helpful: "Subdivision (b)(3) encompasses those cases in which a class action would

### C. Rule 23(b) Factors

 Because Plaintiffs made a threshold showing under Rule 23(a), the court turns to Rule 23(b) to determine if Plaintiffs have satisfied through evidentiary proof at least one of its subsections.[351] Plaintiffs invoke Rule 23(b)(3),[352] which provides:

> A class action may be maintained if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.[353]

As noted above, district courts have a responsibility to conduct a rigorous analysis to test whether a party seeking class certification satisfied the requirements of Rule 23(b).[354] Mindful of the relevant considerations,[355] the court considers predominance and class superiority in turn.

#### 1. Predominance

 Under the theory Plaintiffs advance, they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" [356] This requirement, commonly referred to as predominance, tests whether the class is "sufficiently cohesive to achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

354. *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013).

355. "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

356. *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 261 (D. Kan. 2010).

warrant adjudication by representation." [357]

 While courts vary in their articulation of the predominance standard, most require plaintiffs to show that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, [ ] predominate over those issues that are subject only to individual proof." [358] For some courts, predominance is established "if there is a common nucleus of operative facts relevant to the dispute and those common questions represent a significant aspect of the case which can be resolved for all members of the class in a single adjudication." [359] "Predominance is usually present when the action is based on a common course of conduct on the part of [a] defendant and not on the conduct of the individual class members." [360] More recently, the Tenth Circuit characterized the predominance inquiry as "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." [361]

 Defendants here contend that Plaintiffs cannot establish predominance for three overlapping reasons: (1) proof of injury and damages requires individual evidence and cannot be ascertained from England's data, (2) the claims in this case are far too complex for class resolution assuming choice-of-law principles require application of law from fifty-one jurisdictions, and (3) many of the claims require individual evidence for each individual driver.[362] Before considering Defendants' arguments and the sufficiency of Plaintiffs' showing, the court will first address a threshold issue concerning the availability of inferences relating to reliance and causation as part of a plaintiff's predominance showing.

### a. *Inferences of Classwide Proof*

As an initial matter, the parties dispute whether reliance or causation—elements that vary from claim to claim—are individualized issues requiring evidence for each class member. The Tenth Circuit recently addressed this issue in a similar context in *CGC Holding Co., LLC v. Broad & Cassel.*[363] In *CGC Holding*, the Tenth Circuit considered whether a trial court correctly certified a RICO claim arising out of a fraudulent real estate scheme.[364] On appeal, the lenders argued "each class member will have to demonstrate that it relied on … misrepresentations or omissions to satisfy RICO's causation element, making a single trial unwieldy and unworkable." [365] The Tenth Circuit disagreed, holding that the plaintiffs could rely on "a reasonable inference that the class members relied on lenders' promises" and that the reasonable inference "allays concerns about Rule 23(b)(3)'s requirements that common issues predominate over those idiosyncratic to individual class members." [366]

Discussing cases in other jurisdictions, the Tenth Circuit concluded "issues of reliance can be disposed of on a classwide basis without individualized attention at trial. For example, where circumstantial evidence of reli-

---

**357.** *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

**358.** *Dilley v. Acad. Credit, LLC*, No. 2:07–CV–301, 2008 WL 4527053, at *7 (D. Utah Sept. 29, 2008) (citation omitted).

**359.** *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 261 (D. Kan. 2010).

**360.** *Miller v. Basic Research, LLC*, 285 F.R.D. 647, 657 (D. Utah 2010) (quoting *In re Mercedes–Benz Antitrust Litig.*, 213 F.R.D. 180, 187 (D.N.J. 2003)).

**361.** *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (quoting William B. Rubenstein, Newberg on Class Actions § 4:45 (5th ed. 2012)) (characterizing inquiry as a weighing test).

**362.** Dkt. 245 at 55.

**363.** 773 F.3d at 1094–1095 (concluding presumption of reliance could not be applied to RICO claim, but suggesting presumption could be established for common law fraud claim). Both parties had an opportunity to discuss *CGC Holding* in supplemental submissions to the court. Dkts. 292 and 293.

**364.** *Id.* at 1080–81.

**365.** *Id.* at 1081.

**366.** *Id.*

ance can be found through generalized, classwide proof."[367] The Tenth Circuit observed that it might be "beneficial to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question as required by Rule 23."[368] For RICO claims, the court concluded that "causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any other way than reliance upon the defendant's conduct."[369]

After a careful review of the record and the claims, the court concludes that an inference of reliance and causation is warranted in this case. Here, the circumstantial evidence of reliance is abundant. Individuals relied on promises of economic opportunity when they enrolled in and paid tuition to attend England's driving schools. More importantly, the putative class agreed to become independent contractors, operating under the assumption that the Driving Opportunity offered a feasible career choice. As the court already discussed, members of the class had been exposed, through a variety of mediums, to generally uniform representations that may have been inaccurate. And the record before the court is sufficient to support the conclusion that these representations were part of a concerted effort to recruit individuals to England's independent contractor program and convince

drivers to lease from Horizon. At least for the proposed class, common sense dictates that each class member's reason for attending driving school and joining the independent contractor program was the belief that Defendants offered an income and mileage opportunity that would support a career.[370] There is an "obvious link between the alleged misconduct and harm."[371] For this reason, the court concludes that Plaintiffs are entitled to an inference for the purposes of its Rule 23(b) analysis,[372] and rejects Defendants' theory that individual evidence of reliance and causation bars class certification.[373]

### b. Proof of Injury and Damages

Both parties devote considerable attention in their papers to the issue of damages. Defendants argue that proof of injury and the amount of damages requires individualized evidence and that, as a result, individual issues predominate over common questions. Plaintiffs contend that damages for each claim can be determined by applying the appropriate methodology to England's comprehensive set of data for each driver.

The Supreme Court recently addressed this issue in Comcast Corp. v. Behrend.[374] In Comcast, the district court certified a class of over two million subscribers of a cable-television service for claims arising under the

---

367. *Id.* at 1089.

368. *Id.*

369. *Id.* at 1089–90 (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011)).

370. *Id.* at 1091 n.7 ("It is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable.") (quoting *Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84–85 (N.D. Ill. 1997)).

371. *Hale v. Enerco Grp., Inc.*, 288 F.R.D. 139, 150 (N.D. Ohio 2012) (discussing cases and acknowledging that it may be warranted when reliance was "virtually certain"); *see also Makaeff v. Trump Univ., LLC*, No. 3:10–CV–0940, 2014 WL 688164, at *20 (S.D. Cal. Feb. 21, 2014) (presuming reliance based on state law).

372. In *CGC Holding*, the Tenth Circuit carefully distinguished this inference from a legal presumption. 773 F.3d 1076, 1094 n.12. See also *id.*

at 1089–90 (discussing inference of reliance); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013); *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 603 (S.D. Cal. 2011).

373. Defendants argue that *CGC Holding* is distinguishable. Dkt. 293, at 2–4. In general, Defendants contend that the drivers' diversity of experience presents a different issue than the one presented in *CGC Holding*. This argument is unpersuasive because the court finds that Defendants consistently misrepresented mileage and income opportunities for independent contractors during the class period, and it is reasonable to infer that a rational economic actor would not have agreed to participate in the program if they understood the realities of the program.

374. —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013).

Sherman Act.[375] The district court found that damages could be determined on a classwide basis under a regression model that compared actual prices in a particular region with "hypothetical prices that would have prevailed but for [the company's] allegedly anticompetitive activities."[376] The Second Circuit affirmed. But the Supreme Court reversed for two reasons: (1) the Second Circuit failed to "entertain arguments against [the] damages model that bore on the propriety of class certification," and (2) the regression model failed to reflect the theory of liability.[377]

The Court concluded that, in the absence of an appropriate model, "individual damage calculation will inevitably overwhelm questions common to the class."[378] Specifically, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the specific legal] theory."[379] For this reason, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case."[380] Accordingly, the Second Circuit erred when it "simply concluded that [the model] provided a method to measure and quantify damages [without considering] whether the methodology [was] a just and reasonable inference or speculation."[381]

The Supreme Court then turned to the adequacy of the regression model.[382] Because the certified antitrust claim was limited to one of four possible theories of recovery—anticompetitive clustering—the Court concluded that a regression model that assumed the validity of three uncertified theories of antitrust recovery "failed to measure damages resulting from the particular antitrust theory on which" liability was premised.[383] Relevant was the expert's own testimony that his "model calculated damages resulting from the 'alleged anticompetitive conduct as a whole' and did not attribute damages to any one particular theory of anticompetitive impact."[384] Because the model assumed price increases that were the result of the uncertified theories of recovery, the Supreme Court held that it would be impossible to determine which of the class members were injured by anticompetitive conduct that formed the basis of the certified claim.[385] The Tenth Circuit has described *Comcast* as "premised on the majority's conclusion that without a way to measure damages on a class-wide basis, individualized questions would 'inevitably overwhelm questions common to the class.'"[386]

Plaintiffs' theory of damages in this case is a far cry from the flawed model in *Comcast* and similar cases. Plaintiffs' expert here, Charles Mahla, identifies several reasonable means of calculating minimum statutory damages, actual damages, rescission damages, restitution damages, and value of labor damages for the class.[387] His model and con-

---

375. *Id.* at 1429–30.

376. *Id.* at 1431.

377. *Id.* at 1432–33 (reiterating Rule 23(b) imposes an obligation to conduct a "rigorous analysis").

378. *Id.* at 1433.

379. *Id.*

380. *Id.* (citation omitted) (internal quotation marks omitted).

381. *Id.* (citation omitted) (internal quotation marks omitted).

382. *Id.* at 1434.

383. *Id.* at 1433.

384. *Id.* at 1434 (citation omitted).

385. *Id.* at 1434.

386. *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1258 (10th Cir. 2014) (quoting *Comcast*, 133 S.Ct. at 1433).

387. For example, Dr. Mahla testified that actual damages could be calculated by measuring potential earnings based on England's own statements, comparing the earnings of company drivers, or relying on a reasonable hourly rate, while restitution damages could be determined by measuring the expenses incurred by each driver. Moreover, Dr. Mahla testified that these damages could be determined on a classwide basis using data maintained by Defendants. Specifically, Defendants' records contain substantial information that includes mileage, variable costs per mile, fixed costs, lease payments, fuel use, and net income. Dr. Mahla also points to the settlement statements maintained for each individual member of the class.

clusions are based in part on Defendants' own data. In their papers, Plaintiffs persuasively identify which models are consistent with each theory of recovery.[388] Unlike in *Comcast*, Plaintiffs' theories of liability are consistent with and correspond to models capable of reasonably predicting classwide damages based on specific data.[389]

Defendants contend Dr. Mahla's models fail to account for a range of possibilities, including the possibility that an individual's decision to become an independent contractor had nothing to do with any claimed misrepresentation. To the extent that Defendants' critique of the damages models echoes their causation or reliance arguments, the court has already concluded that the members of the class are entitled on the record presented to an inference of classwide causation and reliance.

█ In addition to the fact of damages, Defendants also argue that the amount of damages requires individualized evidence in this case.[390] Citing their expert, Richard Hoffman, Defendants maintain their database does not contain material information necessary to measure actual damages. In Mr. Hoffman's view, the relative success or failure of each England driver depended on individual variables, including the driver's effort, skill, and efficiency. Operating under a belief that England's database failed to account for these variables, Mr. Hoffman testified that the least efficient driver would receive a windfall.[391]

█ Defendants' argument is unpersuasive. Although Mr. Hoffman's critique may highlight ways to refine Dr. Mahla's model, Defendants have not identified the type of fundamental flaw in the methodology that rendered the disconnected damages model in *Comcast* unworkable. Instead, they have identified areas that may be the subject of mitigating evidence or an alternative model of damages at trial. The *Comcast* Court left open the possibility that damages may be proven by a classwide model, even though the model's calculations were not "exact." [392] The court is also mindful of the general principle that Utah law does not require that actual damages be proven with absolute exactitude. Here, Dr. Mahla's models provide a reasonable means of predicting damages consistent with Plaintiffs' theories of liability. Unlike other cases,[393] Plaintiffs have demonstrated for the purposes of class certification that damages are susceptible to mathematical calculation and classwide proof. Accordingly, the court finds that individualized evidence of damages is not necessary for any of the claims.[394]

**388.** *See, e.g.*, Dkt. 273 at 92–110.

**389.** *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (concluding defendant's database could be used to calculate damages and related penalties for each individual claim); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) *cert. denied*, — U.S. ——, 134 S.Ct. 1277, 188 L.Ed.2d 298 (2014) (discussing policy considerations).

**390.** "Additionally, the district court should consider the extent to which material differences in damages determinations will require individualized inquiries. Although 'individualized monetary claims belong in Rule 23(b)(3),' predominance may be destroyed if individualized issues will overwhelm those questions common to the class[.]" *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013).

**391.** In reply, Dr. Mahla testified that England's dataset contained several variables necessary to evaluate the number of weeks the driver worked as an independent contractor and the driver's mileage.

**392.** *Comcast Corp. v. Behrend*, — U.S. ——, 133 S.Ct. 1426, 1433, 185 L.Ed.2d 515 (2013).

**393.** *See, e.g., Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).

**394.** Even if individualized evidence of damages were necessary, the court would be inclined to bifurcate the issues of liability and damages. *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013); *Johnson v. Nextel Commc'ns*, 293 F.R.D. 660, 675 (S.D.N.Y. 2013). The parties invite the court to consider preemption of limits on statutory damages. Because the court finds that individualized evidence is not necessary to determining actual damages, the court need not reach the issue of preemption at this stage of the proceeding.

c. *Choice of Law* [395]

The next issue is whether choice of law issues prevent class certification. Specifically, the parties dispute: (1) whether the choice of law provision in the Leasing Agreement and Operating Agreement extend to Plaintiffs' statutory and common law claims, and (2) whether this court must apply the laws of fifty-one jurisdictions to the claims in this case.

Defendants correctly assert that neither the Leasing Agreement nor the Operating Agreement is determinative of the choice of law analysis. As discussed above,[396] the language within these agreements is narrow. There is no evidence that the parties contractually agreed to apply Utah law to claims that merely relate to the subject matter of the agreements.[397] For this reason, the court will focus its analysis on whether Utah has the most significant relationship to the parties and the occurrences that form the basis of the remaining claims.[398]

The remaining claims sound in tort.[399] The applicable factors found in Sections 145 and 148 of the Restatement (Second) of Conflict of Laws, are discussed at length above.[400] After careful consideration of these factors and the record, the court concludes that Utah has the most significant relationship to the parties and the occurrences forming the basis of Plaintiffs' statutory and common law claims.[401]

Other jurisdictions bear some relationship to this case. Members of the proposed class reside in forty-eight states, Washington D.C., Puerto Rico, and the Virgin Islands.[402] Class members received phone calls and accessed Defendants' webpages from locations throughout the country and traveled to England's driver training schools, four of which were located outside of Utah. And drivers received some of the representations forming the basis of the remaining claims outside this forum.[403]

---

**395.** The court engaged in a conflict-of-laws analysis for the UBODA claim. Here, the varied nature of the claims makes the choice-of-law analysis somewhat broader. For example, Defendants' management of the independent contractor program from Utah takes on additional significance for the unjust enrichment claim. But to the extent it is relevant, the court incorporates the choice-of-law analysis for the UBODA claim.

**396.** *Supra* Analysis, Part II.B.1.

**397.** In the reply memorandum, Plaintiffs discuss Section 187(2) of the Restatement and Judge Stewart's decision in *Brigham Young Univ. v. Pfizer, Inc.*, No. 2:06–CV–890 TS, 2012 WL 918744, at *2 (D. Utah Mar. 16, 2012). The difficulty in applying Plaintiffs' approach, however, lies in the fact that the parties could have but chose not use broad language in the choice of law provisions of the Leasing Agreement and Operating Agreement. For this reason, Plaintiffs' argument is unpersuasive.

**398.** The court assumes for the purposes of its analysis that there is a true conflict of law for the claims that are the subject matter of this disputes. *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P.3d 1156, 1165 n.10 (Utah Ct. App. 2012); *see also* Dkt. 245 at 98–99 (discussing variation in law for particular claims).

**399.** As discussed below, the court concludes that common issues of fact and law do not predominate over individual issues for the breach of contract claim. Accordingly, the court will not engage in a choice of law analysis or discuss the applicable standard for a breach of contract

claim. *See Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684, 693 (10th Cir. 2004); Restatement (Second) of Conflict of Laws § 188 (1971).

**400.** *Supra* Analysis, Part II.B.2. See also *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684, 693 (10th Cir. 2004); *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002).

**401.** Under the Restatement, courts are encouraged to apply factors insofar as they are relevant to particular claims or issues. Plaintiffs argue that courts in Utah traditionally apply Section 145. Here, the court has applied factors and commentary from Section 148 to the extent relevant to fraudulent misrepresentations. However, the court would reach the same conclusion regardless of whether Section 145 or Section 148 applied.

**402.** Restatement (Second) Conflict of Laws § 148 cmt. i (1971) (observing a plaintiff's residence is a contact of "substantial significance" when the loss is pecuniary).

**403.** Under the Restatement, "the place where the representations were first communicated to the plaintiff" is "as important a contact as ... the place where the defendant made the representation." Restatement (Second) Conflict of Laws § 148 cmt. g (1971). For the purpose of determining where a representation is made, the most important inquiry is where "a major part" of the representation was developed. *See id.* cmt. h.

But Utah has the most significant relationship to the parties and the occurrences that form the basis of the claims. England and Horizon are incorporated and headquartered in Utah. There is significant evidence that the misconduct forming the basis of liability emanated from Defendant's Utah-based headquarters. Indeed, most of the claims are based to varying degrees on the Driving Opportunity and Implementation Plan, both of which were developed, executed, and refined in Utah.[404] Moreover, Plaintiffs and a majority of the class members traveled to Utah, where they executed the Leasing Agreement and Operating Agreement. Once enrolled in the independent contractor program, drivers were controlled by England's Independent Contractor Division and their leases managed by Horizon, both of which were based in Utah. Thus, the court finds that the gravity of the parties' relationship was centered within this forum. Although other jurisdictions undoubtedly have an interest in preventing unlawful practices from harming their residents, no state has a stronger interest in this dispute than Utah.

The court is also mindful of additional considerations under Section 6 of the Restatement.[405] Here, a single case based on a uniform scheme developed in and perpetrated from Utah promotes "ease in the determination and application of the law to be applied" and "certainty, predictability, and uniformity of result."[406] Weighing the interests of various states, the court must conclude that Utah has a stronger interest in ensuring that its corporate citizens do not engage in fraudulent, deceptive, or unfair business practices. Indeed, while application of Utah law may supplant consumer protection laws in other jurisdiction, class resolution of these claims would at least partly serve the needs of the interstate system by providing a forum for efficiently addressing conduct that occurred nationwide.[407] Finally, the court concludes on the record presented that Plaintiffs and Defendants may have harbored justified expectations that Utah law would apply to conduct largely based in Utah.

Defendants argue this conclusion may encourage plaintiffs to engage in forum shopping and file class actions in jurisdictions with the most favorable laws.[408] But that is not what occurred in this case. Here, Defendants relocated this case to their home state, where they had developed a uniform, nationwide program designed to increase enrollment in the independent contractor program and the number of leases. While the drivers may have resided nationwide, Utah remained at the heart of the Driving Opportunity. Its consumer protection laws bear a significant relationship to this case.

For these reasons, the court concludes that Utah bears the most significant relationship to the parties and the occurrences relevant to

---

Here, there is substantial evidence that the representations were primarily developed in Utah.

**404.** For example, Plaintiffs proffered evidence that marketing materials, recruiting guidelines, and scripts were made in Utah. Dkt. 273 at 120–21 (discussing Utah's connection to recruiter training, development of the England Business Guide, and Phase II Upgrade).

**405.** *See, e.g., Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 209–10 (3d Cir. 2013) (discussing applicability of Section 6 to class action); *Mid–Continent Cas. Co. v. Eland Energy, Inc.*, 709 F.3d 515, 524 (5th Cir. 2013); *but see Bobbitt v. Milberg, LLP*, 285 F.R.D. 424, 428 (D. Ariz. 2012).

**406.** Restatement (Second) of Conflict of Laws § 6 (1971).

**407.** *Id.* at cmt. d (observing choice-of-law rules should "further harmonious relations between the states and ... facilitate commercial intercourse between them").

**408.** Dkt. 245 at 101–03. Defendants cite decisions in the Sixth Circuit and Ninth Circuit. Neither of these decisions is persuasive. In *Pilgrim v. Universal Health Card, LLC*, the court held that "consumer-protection laws of the potential class members' home States will govern their claims" based on a strict interpretation of Ohio's "place of the injury" rule for a case involving a program that "did not operate the same way in every State and the plaintiffs suffered distinct injuries as a result." 660 F.3d 943, 946–47 (6th Cir. 2011). In *Mazza v. Am. Honda Motor Co.*, the court held that California's choice of laws rules required application of consumer protection laws of the jurisdiction in which the transaction took place. 666 F.3d 581, 588–95 (9th Cir. 2012). Notably, the analysis hinged largely on well-developed California choice of law principles, which appear to be different than those adopted in Utah.

the asserted claims. Accordingly, the court rejects Defendants' argument that application of choice of law principles prevents a finding of predominance or otherwise makes this case unmanageably complex.

### d. Individualized Issues

Defendants argue that individual evidence predominates over common issues and precludes class certification. In response, Plaintiffs argue that the overarching issue in this case is whether Defendants devised a common scheme that harmed all members of the class.

■ As the Tenth Circuit recently observed, the touchstone of predominance is consideration of "the elements of the underlying cause of action."[409] In its discussion of commonality above, the court identified the elements of Plaintiffs' claims and the common issues of law and fact.[410] The court will now analyze whether Plaintiffs met their burden of demonstrating that these common issues "are more prevalent or important than the non-common, aggregation-defeating, individual issues.[411]

### i. Fraud–Based Claims

The parties devote significant attention to the fraud-based claims, which include common law fraud and negligent misrepresenta-tion.[412] Fraud presents unique challenges for the class action. In the comments to Rule 23(b), the advisory committee noted that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of damages suffered by individuals within the class."[413] Still, it recognized that "although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."[414]

Citing this language, courts have applied different standards to class certification of fraud claims. In the Ninth Circuit, class certification of a fraud claim may be warranted if the plaintiffs show that the claims arise out of a common course of conduct.[415] Courts following this approach permit class treatment of a fraud claim when there is proof that a defendant created a "centrally-orchestrated scheme to mislead" or standardized sales pitch, regardless of whether it is oral or written.[416] But several courts have rejected the common course of conduct standard in favor of a more restrictive standard.[417] In these jurisdictions, oral representations "are presumptively individualized,"[418] but class

**409.** *CGC Holding*, 773 F.3d 1076, 1088 (10th Cir. 2014) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S.Ct. 2179, 2181, 180 L.Ed.2d 24 (2011)).

**410.** *Supra* Analysis, Part III.B.2.b.

**411.** *CGC Holding*, 773 F.3d at 1087 (citation omitted).

**412.** The parties include in this category claims arising under RICO and the UPUAA. Because Defendants are entitled to judgment on the pleadings for the RICO and UPUAA claims, the court cannot reach the issue of whether common issues of law and fact predominate for these claims under Rule 23(b).

**413.** Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment.

**414.** *Id.*; *see Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed.Appx. 938, 944 n.5 (10th Cir. 2013) (encouraging lower court to consider advisory committee's note on remand).

**415.** *In re First Alliance Mortgage Co.*, 471 F.3d 977, 990 (9th Cir. 2006) (discussing class certification in cases with standardized sales pitches or a common course of conduct).

**416.** *Id.* (rejecting argument that plaintiffs should not have relied on a centrally-developed, standardized sales pitch designed to induce borrowers into entering lease agreements); *see, e.g., Joint Equity Comm. of Investors of Real Estate Partners, Inc. v. Coldwell Banker Real Estate Corp.*, 281 F.R.D. 422, 429 (C.D. Cal. 2012) (certifying class of individuals who alleging securities fraud).

**417.** *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253–54 (2d Cir. 2002) (Sotomayor, J.) (discussing decisions in the Third, Fourth, Fifth, Sixth, and Seventh Circuits).

**418.** *Id.* at 1253 (recognizing parties could overcome the presumption with "written, standardized sales script [and] a common training program that emphasized uniformity in techniques").

certification may be warranted if there is "evidence of materially uniform misrepresentations ... sufficient to demonstrate the nature of the misrepresentation."[419] Although the Tenth Circuit does not appear to have adopted one position or the other, the court concludes Plaintiffs have met their burden here under either standard.

For purposes of class certification, the court finds that the key representations forming the basis of potential liability do not materially vary. Plaintiffs have submitted competent evidence showing Defendants uniformly misrepresented projected income and mileage for independent contractors during the class period through written, and at times, oral representations.[420] Although the exact mileage statement varied depending on the medium, the England Business Guide, which was given to each student, remained consistent during the class period. Moreover, while trainees received information from trainers during Phase I and Phase II, there is evidence that Defendants took steps to control the messaging of their recruiters and trainers. Finally, Plaintiffs proffered evidence of a centrally-driven recruitment program with training scripts and "talk tracks" designed to induce enrollment in driver training schools and subsequent purchase of the Driving Opportunity. The record thus reflects a concerted pattern of representations that uniformly misrepresented the opportunities that awaited an independent contractor.

Accordingly, the court concludes the fraud-based claims are susceptible to class treatment.

Still, Defendants argue that reliance on the representations necessarily remains an individualized issue.[421] They correctly assert that Plaintiffs must prove causation and reliance in order to prevail on the fraud and negligent misrepresentations. As discussed above, however, the court concludes that Plaintiffs are entitled to an inference of reliance and causation for purposes of the class certification analysis.

Moreover, while Defendants' anecdotal evidence illustrates the complexity of the fraud-based claims, they have not persuaded the court that individualized issues predominate over common questions. For one thing, the cases cited by the Defendants are distinguishable for lack of a centrally-driven scheme or uniform representation.[422] And the court doubts whether submitting select declarations of individuals describing varied experiences is sufficient to defeat class certification, especially where, as here, the record contains strong indicia of Defendants' intent to induce thousands of individuals into the independent contractor program. Courts must ensure that the requirements of Rule 23 are satisfied, but must also remain focused on the purpose of the class action mechanism.[423] If a defendant could defeat certification merely by identifying alternative reasons for reliance or demanding a determination of

**419.** *Id.* at 1255–56 (concluding no particular form of evidence was required but upholding denial of class certification where the party seeking class certification failed to proffer evidence that members of the class received the representations).

**420.** *Cf. In re First Alliance Mortgage Co.,* 471 F.3d 977, 990 (9th Cir. 2006).

**421.** Dkt. 245 at 62–85.

**422.** Many of these decisions are distinguishable because they did not involve uniform representations. *See, e.g., Berger v. Home Depot USA, Inc.,* 741 F.3d 1061, 1069 (9th Cir. 2014) (concluding trial court did not err in finding that variation in time, location, and oral representation relating to five different leases required resolution of claims on an individual basis); *In re St. Jude Med., Inc.,* 522 F.3d 836, 839 (8th Cir. 2008) (involving serious questions whether class members even received the representation); *Crab House of Douglaston Inc. v. Newsday, Inc.,* 2013 WL 1338894, at *12 (E.D.N.Y. Mar. 29, 2013) (concluding representations were not uniform); *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 398 (6th Cir. 1998)("GM's statements to the early retirees were not uniform."). Others did not involve discussion of uniform representations or barely discussed the issue presented in this case. *See, e.g., Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.,* 319 F.3d 205 (5th Cir. 2003).

**423.** *In re First Alliance Mortgage Co.,* 471 F.3d 977, 992 (9th Cir. 2006) ("The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims."); *cf. Garcia v. Tyson Foods, Inc.,* 770 F.3d 1300, 1307 (10th Cir. 2014) (quoting *First Alliance* in discussing challenge to jury verdict).

causation, Rule 23 would cease to operate as an effective vehicle for resolving collective claims and issues.[424]

Moreover, the language of Rule 23(b) and the advisory committee note suggest that class certification is possible, even with variation in the effect on individual class members, so long as individual issues do not predominate over common questions. Even assuming reliance cannot be presumed, the central issues for the fraud-based claims are questions of law and fact common to the class. As discussed in the preceding section, these common questions include: (1) the materiality of the representations, (2) the truth of the representations, and (3) Defendants' state of mind.[425] These common issues outweigh individualized issues. Accordingly, the court finds that Plaintiffs met their predominance burden for fraud and negligent misrepresentation.

## ii. Breach of Contract

The parties dispute whether common issues predominate for the breach of contract claim. Plaintiffs contend that whether England "failed to fulfill its contractual obligations to subclass members by choosing not to make company trucks available and otherwise preventing subclass members from receiving the fruits of their bargain presents common questions."[426] Defendants respond that proof of a breach of the Student Training Agreement necessarily depends on specific evidence concerning truck availability, the length and materiality of any delay getting a truck, and reasons that motivated individual drivers to become independent contractors.[427]

■■■ The breach of contract claim presents a closer question than the fraud-based claims. As discussed above, the scope of England's obligation and a class-wide determination of damages present common questions.[428] But Plaintiffs cannot recover on their contract claim without proving a material breach. Any such finding on the record presented necessarily depends on whether a trainee intended to become a company driver, whether a trainee asked to become a company driver, whether that opportunity was provided, and whether the length of any delay obtaining a company truck rose to the level of a material breach or resulted in any damages.[429] Unlike reliance or causation discussed in the preceding section, which may be inferred from a uniform program and circumstantial evidence, the alleged breach of contract appears to be based primarily on anecdotal evidence. And although there is evidence of a company-driven recruiting program, a decrease in the number of available company trucks, and a surge in the number of independent contractors, the predicate question of breach—a necessary element of the contract claim—remains a question of fact that likely varied throughout the class period for each individual driver. Given the weight, importance, and centrality of this issue, the court finds that common issues do not predominate over the individualized breach issues for each individual driver.[430]

---

424. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (observing purpose of class action is to create "economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results").

425. *Supra* Analysis, Part III.B.2.b.

426. Dkt. 206 at 76.

427. Dkt. 245 at 88–89.

428. *Supra* Analysis, Part III.B.2.b.

429. *See Cross v. Olsen*, 303 P.3d 1030, 1035 (Utah Ct. App. 2013) (discussing material breach). Plaintiffs disagree with this line of analysis, arguing that the court should exclude testimony of individuals from outside of the class period and individuals who became company drivers. And the evidence submitted by Defendants is sparse. However, the burden of demonstrating predominance rests with Plaintiffs. Unlike the fraud-based claims, for which there is strong evidence of consistent representations, there does not appear to be similar evidence of consistent and systematic delay or the number of individuals who requested company positions.

430. Plaintiffs cite several cases in which courts certified breach of contract claims. These cases appear to be factually distinguishable or unpersuasive. *Gray v. Hearst Commc'ns, Inc.*, 444 Fed. Appx. 698, 701 (4th Cir. 2011) (concluding that certification was warranted for breach of a distribution agreement where the injury was identical

Plaintiffs' request to certify a subclass for the breach of contract claim is denied.

### iii. Unjust Enrichment

The parties dispute whether the unjust enrichment claim requires individual evidence. As discussed above, this claim presents common issues, including whether Defendants adopted a scheme that allowed Defendants to unjustly benefit by distributing their costs to independent contractors.[431]

Defendants contend that liability for unjust enrichment requires individual evidence of each driver's understanding of the independent contractor program, because this claim requires proof of injustice.[432] The court disagrees. Unlike the cases Defendants cite,[433] this case involves allegations and evidence of a centrally-driven effort to induce individuals into joining the independent contractor program using misrepresentations. Based on common evidence, a jury could find that the circumstances surrounding Defendants' successful use of the independent contractor program make retention of the attendant economic benefit unjust. Moreover, as the court discussed in its damages analysis, the expense to each class member and the benefit to the Defendants are susceptible to classwide proof. Accordingly, the court finds that common issues predominate over individualized issues for the unjust enrichment claim.

### iv. Breach of Fiduciary Duty

Similarly, the parties dispute predominance for Plaintiffs' breach of fiduciary duty claim. Based on uniformity in the treatment of trainees, the court concluded above that the existence or nonexistence of a fiduciary duty presented a common issue of law or fact. Similarly, the issues of whether Defendants failed to disclose accurate information and whether Defendants were aware of the inaccuracy of the information provided to class members are common to the class.[434]

Defendants argue that under Utah law, the question whether "a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case."[435] Defendants also argue that the degree of reliance here varied from driver to driver. Neither argument is persuasive. Nothing within the authority cited by Defendants forecloses a classwide determination of the existence of a legal duty. In the decision Defendants rely upon, the Utah Supreme Court appears to have been using the phrase "individual case" to refer to context or circumstances, as opposed to individual plaintiffs.[436] Here, Plaintiffs allege and proffer evidence that the disparity in access to information and the restrictions placed on class members was virtually identical for each independent contractor. And as the court has already discussed, a presumption of reliance is warranted on the facts of this case.

But even if reliance could not be presumed for Plaintiffs' breach of fiduciary duty claim, the court concludes that the common issues—the existence of a duty, disclosure, and the truth of Defendants' representations about the independent contractor program—are of greater weight and importance than the individualized issues identified by Defendants. This is especially so where, as here, Utah courts do not expressly require reliance as a separate element of the claim and damages can be determined on a classwide basis.[437] For these reasons, and noting that the

---

for class members and the issue could be resolved in "one stroke"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013) (acknowledging that individualized questions could predominate on the existence of a breach).

431. *Supra* Analysis, Part III.B.2.b.vii (identifying elements of unjust enrichment and common issues).

432. Dkt. 245 at 86.

433. Defendants rely on *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014). But the

*Berger* court based its analysis on the assumption that there was significant variation in the treatment of each customer. *Id.* at 1070.

434. *Supra* Analysis, Part III.B.2.b.

435. Dkt. 245 at 87.

436. *First Security Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990).

437. *See Gilbert Dev. Corp. v. Wardley Corp.*, 246 P.3d 131 (Utah Ct. App. 2010).

ultimate viability of the claim on its merits is not before the court, the court finds that predominance has been satisfied for the breach of fiduciary duty claim.[438]

### e. *Remaining Claims*

Defendants do not include Plaintiffs' statutory claims in discussing the need for individual evidence.[439] Instead, Defendants appear to argue that choice of law issues or difficulties in determining damages preclude a finding of predominance. The court has already rejected these arguments. But for purposes of clarity and completeness, the court will briefly articulate its findings for each of the statutory claims.[440]

As discussed above, the UBODA claim raises a series of common issues of fact and law, including the existence of a seller-assisted marketing plan, registration with the Utah Division of Consumer Protection, and adequacy of disclosures to purchasers of the Driving Opportunity. On the record presented, there is no indication that any individualized evidence is necessary to resolve liability under the statute. And even if limited evidence was necessary, the common issues strike at the heart of liability and greatly outweigh any individualized determinations. Accordingly, Plaintiffs met their burden of demonstrating that common issues predominate over individual issues for their UBODA claim.

Similarly, Plaintiffs' Utah Consumer Sales Practices Act claim centers on the resolution of common questions of law and fact. Specifically, common evidence will be used to deter-

mine whether the Driving Opportunity constituted a consumer opportunity and whether Defendants engaged in any number of prohibited deceptive sales practices. Because these issues, as well as damages, can be proven by classwide proof, the court finds that common issues predominate of any individual issues for the claim arising under the Sales Act.

Finally, the court finds that predominance has been satisfied for Plaintiffs' Utah Truth in Advertising Act claim. Here, the jury can determine liability by evaluating uniformly inaccurate representations during the class period. Similarly, any determination of a deceptive trade practice and application of statutory definitions can be made on common evidence. On the record presented, the court finds that common issues under the Advertising Act predominate over individual issues.

### D. Superiority of Class Action

■ This court must consider whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[441] The inquiry centers on "the relevant advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs."[442]

■ After considering the relevant factors, the court concludes that a class action in this case would be superior to other methods of adjudication. Defendants do not specifically discuss or contest that the class action mechanism provides a superior means of resolving this dispute.[443] But more importantly,

---

438. *See, e.g., Pinkston v. Wheatland Enterprises, Inc.*, No. 11–CV–2498, 2013 WL 1302053, at *5 (D. Kan. Mar. 27, 2013) (concluding individual issues "are secondary to the primary issues in this litigation").

439. Dkt. 245 at 65.

440. For each of the statutory claims, the court incorporates the identification of elements and discussion of common issues of law of fact in the commonality analysis. *Supra* Analysis, Part III. B.2.b (identifying common issues for statutory claims). To the extent relevant, the court also incorporates its discussion of a classwide determination of damage and inferences of causation and reliance.

441. Fed. R. Civ. P. 23(b)(3) (identifying relevant factors, including individual interest in prosecuting the action, other litigation, the desirability of the forum, and the difficulties of managing the action).

442. *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004); *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) ("The rule asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."), *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

443. Defendants argue that application of the law of fifty-one jurisdictions "would make the trial

this case does not involve an instance where the interests of individual class members favor separate actions or already pending litigation. The court finds that concentrating the claims of a nationwide class of drivers in a single forum is desirable, especially where Defendants are located in the forum state. Given the analysis above and the proposed trial plan, the court finds the benefits of the class action outweigh any difficulties that may be encountered in the course of this litigation.

Moreover, there is evidence in the record that the putative class includes individuals of insubstantial means. Here, the cost and recovery of a single case would make it unlikely that thousands of individuals purportedly harmed would seek recovery outside a class action context.[444] On the claims and record presented, a class action not only promotes efficiency but also promotes the public interest, insofar as the class action enables both parties to efficiently test their respective claims and defenses, as well as the reach of consumer protection laws in the forum.[445]

Because the fairness and efficiency of a class action outweigh resolution of these claims on an individual or alternative basis, the court finds Plaintiffs met their burden of demonstrating superiority under Rule 23(b)(3).[446]

### E. The Utah Consumer Sales Practice Act & Administrative Notice

As noted, Plaintiffs assert a claim under the Utah Consumer Sales Practices Act. The Act states that a "consumer who suffers loss as a result of a violation of this chapter may bring a class action for the actual damages caused by an act or practice specified as violating this chapter by a rule adopted by the enforcing authority."[447] Plaintiffs claim Defendants violated Rule 152–11–11 of the Utah Administrative Code,[448] which states that a party "in the trade or commerce of establishing a franchise or distributorship" commits an "unfair or deceptive act" through various types of misrepresentation or failures to disclose.[449]

Defendants contend that Plaintiffs cannot bring the claim because the Driving Opportunity is not a "franchise or distributorship." The Administrative Code defines a "franchise or distributorship" as "a contract or agreement requiring substantial capital investment, either expressed or implied, whether oral or written, between two or more persons," where other additional (undisputed) requirements are also present.[450] In Defendants' view, the Driving Opportunity, including its Vehicle Lease Agreement,[451] did not require "any capital investment, much less a substantial one."[452]

▉ This argument is unconvincing. The record evidence amply supports the proposition that the Vehicle Lease Agreement required substantial payments. Further, an equipment lease of this kind is a form of capital investment, wherein drivers seek to earn income through the acquisition and use of an asset to generate additional wealth.[453]

---

unmanageably complex." Dkt. 245 at 97. Because Utah law applies to the claims, this argument is unpersuasive.

**444.** *See In re Mercedes–Benz Antitrust Litig.*, 213 F.R.D. 180, 191 (D.N.J. 2003).

**445.** *Id.* at 192.

**446.** *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 309 (3d Cir. 2005) (characterizing inquiry as a balancing test).

**447.** Utah Code Ann. § 13–11–19(4)(a).

**448.** Dkt. 206 at 63–67.

**449.** Utah Admin Code r. 152–11–11(B).

**450.** *Id.* r. 152–11–11(A)(2).

**451.** *See* Part II–A.

**452.** Dkt. 245 at 106.

**453.** Notably, leading reference materials treat equipment leases as a sub-category of capital investments generally. *E.g.*, *Leases*, 55 BUS. LAW. 1975 (2000) ("Equipment leasing transactions accounted for over $220 billion dollars during 1999, representing approximately thirty percent of all new capital investment in the United States"); Edwin E. Huddleson III, Barry A. Graynor, Lawrence F. Flick II, Stephen T. & Whelan, *The Uniform Commercial Code Survey: Leases*, 59 BUS. LAW. 1581 (2004) ("Over $215 billion in equipment lease transactions occur annually, accounting for roughly one-third of all capital investment each year in the United States.").

As a result, the court finds that the Driving Opportunity meets the statutory definition of being a "franchise or distributorship" within the meaning of the Administrative Code, and that Plaintiffs may proceed with their claim for actual damages under the Utah Consumer Sales Practices Act.

## F. Notice

Under Rule 23, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." [454] Plaintiffs indicate that they have retained a firm that specializes in legal notification plans that would comply with the rules. Although Defendants contend that the notice should contain additional language for particular claims, they do not seriously contest the adequacy of the proposed notice. Accordingly, the court directs Plaintiffs to prepare a final plan for notice to class members consistent with the requirements of the Rule, and submit it to the court for approval no later than thirty (30) days from the issuance of this opinion.

## CONCLUSION & ORDER

For all the reasons stated, the court concludes that Defendants are entitled to judgment on Plaintiffs' RICO and UPUAA claims, but are not entitled to summary judgment on Plaintiffs' UBODA claim. Plaintiffs are entitled to certification of a nationwide class for some of their claims. Accordingly,

1) Defendants' Motion for Partial Judgment on the Pleadings [455] is GRANTED,
2) Defendants' Motion for Summary Judgment [456] is DENIED, and
3) Plaintiffs' Motion for Class Certification [457] is GRANTED IN PART AND DENIED IN PART.

The court further ORDERS:

For claims for violations of the UBODA, the Utah Consumer Sales Practices Act and the Utah Truth in Advertising Act, as well as their common law claims for fraud, negligent misrepresentation, unjust enrichment and breach of fiduciary duty, the certification of a nationwide class of all Independent Contractor lease operators who:

1) signed the Vehicle Leasing Agreement with Horizon,
2) signed the Independent Contractor Operating Agreement with England,
3) during the applicable statute of limitations period, and
4) drove at least one day as an IC lease operator for England.

SO ORDERED this 31st day of January, 2017.

---

**454.** Fed. R. Civ. P. 23(c)(2)(B) (setting out contents of the notice).

